**Glennda CARVER,
Petitioner-Respondent,**

v.

**John Scott CARVER,
Respondent-Appellant.**

**No. KCD 28779.**

Missouri Court of Appeals,
Kansas City District.

Oct. 11, 1977.

Motion for Rehearing and/or Transfer
Denied Oct. 31, 1977.

Application to Transfer Denied
Dec. 19, 1977.

---

J. R. Fritz, Lamm, Barnett, Crawford & Fritz, Sedalia, for respondent-appellant.

Adam B. Fischer, Durley, Keating & Fischer, Sedalia, for petitioner-respondent.

Before SWOFFORD, P. J., PRITCHARD, C. J., and DIXON, J.

DIXON, Judge.

These appeals from motions to modify a divorce decree were consolidated. The mother's appeal from the motion for child support was dismissed. Pending is the father's appeal from his motion seeking a judicial determination of his right of reasonable visitation. The sole issue is the propriety of the trial court's denial of the father's request that he be permitted to exercise his right of visitation in the State of Pennsylvania where he resides.

The parties were divorced in 1974. The decree was entered on the mother's petition, the father defaulting. Service was by substituted service, and no order respecting child support was entered. The parties owned a home and personal property in Pennsylvania; and, after the decree of divorce was entered, the parties entered into negotiations for the resolution of the property matters, visitation, and support. The mother was represented by a Pennsylvania lawyer, but the husband undertook to represent himself. These negotiations took place after the decree of divorce and were reduced to a formal written contract which is in evidence. The agreement was drafted by the Pennsylvania lawyer representing the mother. In substance, the agreement provided for the sale of the property and the equal division of the proceeds after satisfaction of indebtedness and payment of expenses. The contract bound the father to pay $125 per month child support to be increased to equal 15% of gross wages earned by the father if his salary increased. The agreement recited the mother's right to custody subject to the father's right of visitation for six weeks in the summer and one week during Christmas, the parties to alternate Christmas day. The father was to pay costs of the child's transportation, and support payments were to continue during visitation periods. The parties agreed to each insure their own lives for $10,000 with the child as beneficiary.

The apparent resolution of the dispute did not long endure. In September, 1974, the father wrote a letter to the mother's attorney in Pennsylvania soliciting him to represent the father in a challenge to the mother's custody. The letter suggests that the dispute be transferred to Pennsylvania by the device of filing the custody action there while the child was in Pennsylvania. The father was in doubt about the legality and conceded that such action might be unscrupulous. He then requested the lawyer's advice. The mother offered this letter in evidence in this proceeding, and the only possible inference is that the Pennsylvania lawyer sent it to the mother. The Decem-

ber, 1974, and January and February, 1975, checks sent for support were never cashed, or were returned, as was the plane ticket for the December visitation. The mother filed an application under the reciprocal act to require the father to support the child, and the Pennsylvania court ordered a payment of $117 per month, which the father paid until the date of the hearing.

What has been thus far stated is all a part of the record in this case, but it does not appear in that chronological order. It has been so stated in this opinion to put in perspective the witnesses' testimony and the proceedings in the hearing on the motions.

The testimonial evidence in this case was presented in a very fragmented and disjointed fashion. The record reflects considerable acrimony between counsel and understandable impatience by the court with both counsel. The testimony was begun in late morning and, by reason of other settings, interrupted at noon to be continued at 2:30 p. m. At the time of the noon recess, counsel for the father, referring to a recess earlier occurring, indicated the trial court had prejudged the case and attempted to make a record. The attempt resulted in the court making a statement in the record. The following portions indicate the tenor of the court's remarks:

"THE COURT: My position was, I have heard all of the petitioner's evidence. You now tell me, after that conference, you have additional redirect to put on. I indicated that in view of the problems that the Court has in interstate transportation, that my experience has been grossly unsatisfactory. And in those limited cases in the past, where I have granted permission that the child be taken out of the jurisdiction for visitation purposes, that strong protective measures should be required, such as posting bond, cash money, in the amount sufficient to cover the living expenses and attorney's fees of the other party, the primary custody that would have to go to the other State to secure custody of the child. Off the top of my mind, I mentioned the figure of twenty-five hundred dollars.
. . . .

There are thousands of cases where the non-custodial parent has taken a child out of the jurisdiction of the Court with exclusive jurisdiction, or kidnapped the child and refused to return them to the jurisdiction of the Court. . . . *The man has written to this Court many times, making numerous complaints about the lawyers in this State, in this County, about the Prosecuting Attorney, and I am not inclined at this point in the proceedings—no evidence is shown why this visitation should occur in Pennsylvania. So my statement stands at this point in time. I am not inclined to permit out-of-State visitation."*

The trial court had earlier, at the very outset of the hearing, referred to this correspondence as follows:

"THE COURT: Give me that address again. I notice I corresponded with this fellow at Fitzwater Road, Willow Grove, Pennsylvania."

Further demonstrating the tenor and flavor of the hearing, another transcript reference is required. When the husband was testifying after the noon recess, the following occurred:

"Q Since that agreement, you have exercised visitation with Andrea one time, and that was the summer of '74, I believe your testimony was?
A Yes. Yes. That is correct. I think it is perhaps pertinent to add—
THE COURT: I don't want any narratives from this witness. I was waiting for an objection. It is obviously a narrative of this witness and not responsive to any question."

Further, in a colloquy between counsel as to the introduction of the letter to the Pennsylvania lawyer, the court interjected:

"It does constitute a very low opinion of the Courts of this State and the Judges thereof."

The attitude of the court is further indicated by his remarks at the conclusion of the evidence at approximately 7 p. m.:

"Now, I have tried, I have listened for at least an hour and a half this morning. I was accused by counsel for foreclosing

his right to listen to evidence. I have been listening to evidence from four until seven p. m. I don't think, even in the City of Brotherly Love, that any family Court sits this late.

.  .  .  .  .

Now, there is a nation-wide problem, as I have commented before, about fathers kidnapping, or other parents, kidnapping children from the custodial parent. There is evidence in this record that they have tried to contract. This Court reserves exclusively the right to determine child custody. And every trial Court in the State of Missouri does it. No private agreement is binding on this Court regarding any welfare of the children."

The obvious impatience of the trial court is understandable in the light of the record in this case. There are pages and pages of colloquy between counsel, and the testimony actually given is quite short and could have been presented in a relatively short time. The record also indicates the trial judge had been involved in a jury trial the preceding day which ran into the late evening hours.

As noted, the relevant testimonial evidence on the issue of visitation was very limited. The father testified that he had facilities to care for the child at his home in Pennsylvania, that they had gotten along well on the occasion when visitation occurred there. He pointed out that he had obeyed the agreement to the letter. He asserted he would respect the mother's wishes as to asserting his views to the child. The mother testified that she was not concerned about his care and custody of the child for short periods, but was concerned about his "influence" on the child if he had extended rights of visitation. She expressed concern about the child traveling alone by plane.

The parties on this appeal do not question the right of the father to visitation. The sole question at issue is the place and scope of the visitation. The parties argue the issue as one of abuse of discretion. Abuse of discretion has been defined: "An abuse of discretion is an erroneous finding and judgment which is clearly contrary to the

facts . . . and circumstances before the court—a judicial act which is untenable and clearly against reason and which works an injustice." *State v. Stubenrouch,* 499 S.W.2d 824, 826 (Mo.App.1973); *State v. Letourneau,* 515 S.W.2d 838, 844 (Mo.App. 1974).

The question of whether review is by the standards of *Murphy v. Carron,* 536 S.W.2d 30 (Mo.banc 1976), or as a review of judicial discretion is academic. This court either weighs the facts and circumstances before the court and finds that the judicial act is untenable, clearly against reason and works an injustice, or exercises a power to set aside a judgment on the ground that it is against the weight of the evidence, such power exercised with caution and a firm belief that the judgment is wrong.

So viewed, this court has come to the conclusion that the judgment in this case must be modified. In so concluding, the unquestioned finding that the father is entitled to an eight day unsupervised visitation on two separate occasions each summer must be taken to mean that the trial court did not find that the mother's concern as to the possibility of emotional or physical harm was justified under the evidence. The improper imposition of the father's beliefs as well as physical harm to the child could as well occur in Missouri as in Pennsylvania. If the concern of the court was that the father could not be trusted to return the child to the custody of the mother, the order as made would not have precluded that possibility. The father, during an eight-day period of visitation, could easily remove the child from the State. It seems apparent that the father's predilection to unfortunate comments about the bench and bar and his ill-advised comments concerning the possibility of instituting a custodial litigation in Pennsylvania may have had an impact on the trial judge, resulting in the limitation of the visitation to the State of Missouri.

The trial judge's comments concerning the difficulties of enforcing subsequent orders had support in the decisions. *Northrup v. Sieve,* 517 S.W.2d 470 (Mo.App.1974). The court there stated the rule as follows:

"While it is ordinarily against the policy of the law to permit the removal of a minor child to another jurisdiction because of the difficulty of enforcing subsequent orders, such policy is never allowed to stand in the way of the best interests of the children and must give way to the higher policy of permitting visitation when it clearly appears that such removal is for the best interests of the children. Numerous decisions recognize that the natural parent may remove the children to another state or even a foreign country if it is made to appear that the welfare of the children will be subserved thereby. . . . The courts encourage the continued interests, love and affection of divorced parents for the children and strive to afford to the children ample opportunity to have close contact with *both* parents as the children mature." (517 S.W.2d at 474).

*Fago v. Fago*, 250 S.W.2d 837 (Mo.App. 1952), a much older case, permitted out-of-state visitation upon the basic facts very similar to the present case, and *Northrup* indicates that the higher policy is to permit visitation where possible.

The decree should be modified to permit the father some visitation in Pennsylvania. As to the extent of the visitation, the agreement between the parties is relevant. The mother testified that she was coerced in the execution of the agreement. The circumstances and the agreement, however, do not support that assertion. Her Pennsylvania lawyer drafted it; the father was not represented and did not know until visitation was refused that, absent a court order embodying the provisions as to visitation, they were not enforceable. He proposed an escalating child support payment and insisted on insurance for the benefit of the child. The mother did not have to agree; she had the right to pursue her remedies, absent the agreement, to require the sale of the real estate. It seems appropriate to order that the visitation rights of the father be defined generally as stated in the agreement.

The cause is reversed and remanded with directions to enter an order as to visitation as follows:

John Scott Carver shall have the right of visitation with the minor child, Andrea Nicole Carver, for a period of thirty days during the summer vacation of the child's school year, such visitation to permit him to remove the child from the State of Missouri. The parties shall agree upon the specific times for the exercise of such visitation, but in the event they do not agree, the visitation shall be for the thirty-day period ending two weeks before the beginning of the fall term of school. And John Scott Carver shall further have the right of visitation without the State of Missouri for a period of seven days during the Christmas school holidays, said week to either begin two days following Christmas or end two days prior to Christmas, depending upon the school vacation period and the day of the week upon which Christmas falls. John Scott Carver shall pay the costs of transporting the child from her residence to his residence and the cost of returning her. The support payments shall continue during any month or part of the month that visitation is exercised.

All concur.