Marilyn Lee MANSELL, Appellant,

v.

Gerald A. MANSELL, Respondent.

No. 30292.

Missouri Court of Appeals,
Western District.

June 11, 1979.

Sally E. Wells, Wells, Eisberg, Slough &
Connealy, Kansas City, for appellant.

William A. Mayer, Kansas City, for respondent.

Before HIGGINS, Special Judge, Presiding, SWOFFORD, C. J., and ROBERT R. WELBORN, Special Judge.

ROBERT R. WELBORN, Special Judge.

Child custody proceeding. In dissolution decree dated July 17, 1975, custody of Liza Lee Mansell, born March 29, 1973, to Marilyn Lee Mansell and Gerald A. Mansell, was awarded to mother. The father, by motion filed August 22, 1977, moved to amend the decree by awarding custody to him. The mother, by motion filed December 5, 1977, sought to amend the original decree to permit her to remove the child to California. The motions were consolidated. The matter was heard on April 5, 1978, upon an amended motion of the father filed that date. By an order filed May 1, 1978, the trial court placed custody of the child with the father and gave the mother the right of visitation "only in the State of Missouri and not over night," with the right of overnight visitation for alternate weekends from 7:00 P.M. Friday to 5:00 P.M. Sunday if the mother was living in lawful wedlock. The order further required that, as a condition of visitation in the State of California, the mother be required to deposit $1,500 in cash in the registry of the court, to be released upon the return of the child to her father, with further provision that, in the event of non-return of the child to Missouri, the fund might be paid to the father for expenses in going to California in order to attempt to enforce the Missouri order. The mother has appealed from the decree.

The fundamental question on this appeal is whether or not the conduct and attitude of appellant following the dissolution of her marriage with respondent constitutes a change in the circumstances of the custodian of a child within the meaning of Section 452.410, RSMo 1975 Supp., so that modification of the prior custody decree was authorized.

Appellant Marilyn, 35 years of age at the time of the hearing, had been thrice married prior to her marriage to respondent Gerald. Her first marriage in May, 1961 to Max Bagshaw ended in divorce in September, 1963. A daughter, Deidre, was born to that union. She was married to Jerry Dean Chance in 1964 and they were divorced in 1969. A daughter, Shelby, was born to that marriage. A second marriage in August, 1969 to Bagshaw ended in divorce after eight months. The marriage to Gerald occurred in September, 1970, terminating in dissolution in July, 1975.

Gerald had been married in 1967. A child was born to his wife during that marriage, but Gerald denied that he was the father. Gerald did not support the child and it had been adopted. The date of termination of that marriage does not appear. Following the dissolution of his marriage to Marilyn, Gerald, on November 22, 1975, married Jo Anne Blackland. A son was born to that marriage September 28, 1976. Gerald, Jo Anne and the son lived in a two-bedroom apartment in Merriam, Kansas, at the time of the hearing.

Following dissolution of the Marilyn-Gerald marriage, Marilyn lived at the house on 51st Terrace in Kansas City which she received upon distribution of the marital property. Her daughters, Deidre, Shelby and Liza, lived with her. Marilyn worked as a receptionist in a real estate office.

In the fall of 1975, Marilyn began dating Steve Akin. According to Deidre, Marilyn would be out with him three or four nights a week until from 11:00 to 4:00 a.m. Akin also began spending the night with Marilyn in her home. Sometime early in 1976, Deidre told Marilyn that she did not like the idea of Steve's spending the nights at the house and that Marilyn would have to make a choice between her (Deidre) and Steve. According to Deidre, Marilyn told her that the choice would have to be hers and Deidre decided to leave and go live with her father.

Both Akin and Marilyn denied that Akin had spent the night at Marilyn's before Deidre left. According to Marilyn, she and Deidre had previously discussed the possibility of Deidre's moving to her father's and they had agreed that when Deidre reached

an age which would permit her to make a rational decision on the matter she could do so. Deidre was becoming rebellious at the restrictions which her mother imposed and the inference is that Deidre took advantage of the Akin situation to press an ultimatum upon Marilyn: "Either him or me." According to Marilyn, she told Deidre that she could not permit Deidre to blackmail her into such a decision and that if Deidre wanted to move she could.

Undisputed is the fact that in April, 1976, Marilyn and Steve entered into a written contractual arrangement under which Akin did move into Marilyn's house and share her bed. The two held themselves out as husband and wife. They shared their incomes and Marilyn used the name Akin. Steve assisted in the upbringing of the children, Shelby and Liza, and he and Liza got along very well.

The contractual arrangement between Steve and Marilyn terminated after one year, for reasons which neither would disclose. Steve then departed.

A short time later, Marilyn resumed an acquaintanceship with Randy Amos whom she had known since she was 13 years old and whom she dated as a high school student. Amos was in California and after some correspondence, Marilyn spent her vacation in California with him. In the fall of 1977, Amos, also divorced, came to Kansas City with his two boys. Marilyn and he were contemplating marriage and wanted to see how the children got along. Marilyn and Amos spent one night at a Kansas City hotel, leaving the children in charge of her 17-year-old niece. The niece's boyfriend spent the night also.

According to Marilyn, she and Amos decided to marry. She moved to California, taking Shelby and Liza, and moved in with Amos. At the hearing, Marilyn said that they planned to marry July 4. Appellant's brief indicates that the marriage did occur but the record is otherwise silent on the subject.

Respondent's motion for change of custody alleged as grounds for the action sought that appellant had failed to provide ade-

quate medical care for Liza; that she had failed to provide adequate supervision for the child in her absence; that she had shared her residence for a year with a man not her lawful husband and that she had engaged in illicit sexual activity while the child was in the house. The trial court made no findings of fact although he did find, in effect, that the charge of providing inadequate medical care had not been proved.

In a letter to counsel, the trial court explained his decision as follows:

"Perhaps the most persuasive evidence in this case is the shocking revelation that this matter does not come before the Court for review because of an isolated event, but rather because of an openly adopted way of life.

"Petitioner has had numerous marriages, five in the past and one contemplated in the future. The fact is indicative of an instability but is not the compelling force in the decision. Rather it is Petitioner's chosen lifestyle that has already separated her from one child (Deidre), and unless the Court intervenes those established moral standards could well be adopted by Liza as the ones that are principled and accepted.

"Petitioner's ethical choices are not spontaneous, but well chosen and calculated. They are selfish to the extent that she would not give moral leadership to her daughter (Deidre), but instead thrust her from the home rather than surrender the attachments of her then present affair. The protestations of her daughter went unheeded. Unfortunately, Liza does not have the maturity or opportunity to exercise her choice; she is a captive and needs protection. Equally important is the fact that Deidre needs to understand that the courts neither condone nor approve of Petitioner's principles and ideals. The ethical values of the next generation are being molded now, and it is not the desire of this Court to put the stamp of approval on the quality of virtue established in Petitioner's home."

Appellant first contends that the trial court's order is erroneous because respon-

dent did not sustain his burden of proving a change of circumstances making a change of custody necessary to serve the best interest of the child.

If the order is to be upheld, it must be on the basis of the trial court's conclusion that the mother's life style had produced an environment which threatened the proper upbringing of her daughter. There can be no question that the appellant's choice of life style which the court found adverse to the best interest of Liza was a situation which arose subsequent to the original custody decree. Appellant argues, however, that there was no showing of adverse effect on Liza as a result of appellant's relationship with Akin.

Without equating the conduct of appellant in this case with that of the mother involved in *L. H. Y. v. J. M. Y.*, 535 S.W.2d 304 (Mo.App.1976), what the court said in that case is here apropos:

"The mother points to current social trends as allowing for greater permissiveness in moral attitudes and suggests that she had been doing no more than living to accepted mores. It is not our function to indite a revisionary preachment as to moral models. We do recognize that today we have changing standards of morality. Certain conduct once looked upon by society with opprobrium does not carry the social or private stigma it once did a few short years ago. Such conduct may even be socially 'approved.' But private personal conduct by a parent which could well have an effect on children during the years in which their character, morality, virtues and values are being formed cannot be ignored or sanctioned by courts. Private conduct of a parent in the presence of a child or even under some other circumstances may well influence his or her young, impressionable life.

"We do not pass judgment on private morality in the absence of some societal interest. That is left to others. Our concern here is the best interest of the child. That is the polestar we are duty bound to follow. There was sufficient evidence for the trial court to conclude that the conduct of the mother in this case, under all the circumstances, was not compatible with that ultimate objective. No matter how she or society views the private morality of the situation, we cannot ignore the influence her conduct may well have upon the future of this child and cannot give our judicial cachet to such conduct by etching in the lawbooks for all to read and follow.

\* \* \* \* \* \*

"We are also unimpressed by the mother's argument that there can be no custodial change unless there is evidence of some harm to the son. She argues that since the boy is currently normal and healthy no basis exists for the custody modification. We believe that the boy's present condition is in spite of rather than as a result of the mother's care, and it is not necessary to wait for manifestations of harmful consequences before action is taken." 535 S.W.2d at 308.

■ Here the trial court concluded that appellant's life style was potentially harmful to the moral development of Liza. This court cannot find such ruling erroneous either factually or legally.

■ Appellant argues that the trial court erred in admitting evidence of her marital history contending that her previous experiences, having antedated the original custody decree, could not be considered on the request for change of custody. As the trial court pointed out, it did not base its order upon the prior marital history of appellant. However, it would have been practically impossible to exclude such evidence as it might bear on the future of Liza. Hopefully, the asserted present marriage of appellant may prove more enduring than her previous ones. However, her history does not provide reason for optimism and the court could well consider the history in the light of the life style adopted by appellant upon the most recent dissolution of her marriage.

■ This having been a court-tried case, the admission of evidence, even the erroneous, can hardly ever be grounds for reversal of the trial court's judgment. Even if the evidence as to appellant's marital back-

ground is not considered, there is sufficient evidence to support the trial court's decree so that the admission of such evidence is at the most harmless error. *Gould v. Starr*, 558 S.W.2d 755, 769[10–11] (Mo.App.1977).

Appellant contends that the trial court's decree was the result of the trial court's giving undue credibility to the testimony unfavorable to appellant, especially the testimony of Deidre Bagshaw, and by failing to give sufficient consideration to the testimony of appellant, her witnesses and the custodial investigator appointed by the court. The latter testified that, as a result of his investigation, he recommended no change of custody from appellant. Appellant's witnesses also testified that Liza was a happy, well-adjusted child.

This is, in effect, an argument that the decree of the trial court is against the weight of the evidence. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), admonishes that an appellate court is to set aside the trial court's judgment in a court-tried case on the grounds that it is against the weight of the evidence only "with caution and with a firm belief that the decree or judgment is wrong." 536 S.W.2d 32. Credibility judgments were necessary in this case. The testimony of witnesses was diametrically opposed on significant facts. The trial court was in a much better position to arrive at the correct judgment on that issue. This court will not disturb his ruling on that basis.

There is merit to the complaint of appellant that the trial court's decree unduly limited her right of visitation with Liza. ██ Section 452.400 recognizes the visitation right of a non-custodial parent " * * * unless the court finds, after a hearing, that visitation would endanger the child's physical health or impair his emotional development." The trial court here made no such finding. However, in view of the fact that appellant was a resident of California at the time of the order granting her visitation rights, the practical effect of the order was to preclude the exercise by appellant of such right. Although the non-custodial parent's residence in another state presents problems with respect to visitation, that fact does not call for a denial of such privilege. *Carver v. Carver*, 558 S.W.2d 340, 343–344[2] (Mo.App.1977). Upon a showing that appellant is able to provide for visitation in California in a normal home environment, the appellant should be permitted visitation rights there for a period of thirty days each year during the summer school vacation season, together with such visitation rights otherwise as the trial court might consider proper in the light of appellant's current home situation.

██ No statute authorizes the requirement imposed by the trial court for a cash deposit by appellant as a condition of visitation in the State of California. The trial court expressed concern about the tendency of authorities in that state to ignore custody orders from this state. However, such concern does not permit an unauthorized condition to be imposed upon the exercise of visitation rights in that state. It might be noted that California has enacted the Uniform Child Custody Jurisdiction Act. West Ann.Civ.Code, §§ 5150–5174 (1978 P.P.). Section 5164(2) thereof provides:

"A person violating a custody decree of another state which makes it necessary to enforce the decree in this state may be required to pay necessary travel and other expenses, including attorneys' fees, incurred by the party entitled to the custody or his witnesses."

Missouri has also adopted this act. Laws of Mo.1978, p. 688. Hopefully such enactments may improve relations in this area.

Decree awarding custody to respondent affirmed. Portion of decree granting visitation rights to appellant set aside and cause remanded to trial court for further proceedings and entry of new decree according appellant visitation rights.

Affirmed in part; reversed and remanded in part.

All concur.