Gayle A. MILLER, Petitioner–
Respondent,

v.

Joel K. MILLER, Respondent–
Appellant.

No. 26909.

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 21, 2006.

James R. Sharp, Sharp & Bredesen, Springfield, for appellant.

Susan S. Jensen, Pratt, Fossard, Jensen & Masters, L.L.P., Springfield, for respondent.

KENNETH W. SHRUM, Presiding Judge.

This is a dissolution of marriage case.[1] The trial court dissolved the marriage of Gayle Miller ("Mother") and Joel Miller ("Father"), awarding Mother sole legal and physical custody of the two minor children, Hayley and Garrison, with only supervised visitation for Father. Father appeals.

On appeal, Father makes seven claims of trial court error. Generally stated, Father challenges as erroneous the custody plan, the amount of child support ordered (both prospective and retroactive sums), the attorney fee award to wife, and that part of the judgment ordering Father to make a lump sum payment to Mother to equalize the marital property division. Several of Father's points have merit (Points I and IV–VI). We reverse outright the part of the judgment complained of in Point I. We reverse and remand that part of the judgment addressed in Points IV–VI.[2] In all other respects, the judgment is affirmed.

## STANDARD OF REVIEW

In reviewing a trial court's judgment in a dissolution case, this court must follow the well-known standards of *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976). *Mehra v. Mehra*, 819 S.W.2d 351, 353 (Mo.banc 1991); *In re Marriage of Michel*, 142 S.W.3d 912, 917 (Mo.App. 2004). Thus, the decree must be affirmed unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 917[1].

## FACTS

Father and Mother married October 18, 1986, and separated in October 2000. Two children were born of the marriage, Hayley (December 14, 1995) and Garrison (October 18, 1999). Throughout the marriage, Mother was the primary caregiver to the children as she worked only on weekends and Father worked during the week.

After the separation, Husband visited the children during the daytime on Saturdays and Sundays, every other weekend. He also saw the children "for an hour or so" two to three times during the week. This visitation schedule continued until approximately August 2001. At that time, Mother shortened the visitations because Hayley stated that Father "massag[ed] her between her legs" during a "tick check." Mother sought to stop the visitations altogether, but was told by her attorney that this was not possible.

---

1. All statutory references herein are to RSMo (2000) unless stated differently. All rule references are to Supreme Court Rules (2005) unless otherwise indicated.

2. As explained below, we remand the attorney fee part of the judgment (addressed in Point VII) so that it may be revisited after other reversed parts of the judgment are dealt with on remand.

Father admitted to viewing pornography on the Internet (first manifesting itself in 1995) and sought counseling for this problem. In psychological evaluations ordered by the trial court, Father described his addiction to pornography, claiming it was "[k]ind of like drugs. Seems to take more and more." He claimed he viewed "anything that had to do with sex" and "the more bizarre the better." He further told the psychologist, Dr. Bradford, that he "saw a lot of young children being abused." Father would search the Internet for "anything out of the ordinary" including child pornography, "hard core things" such as "rape, torture, pretty much bondage stuff," and "animals."

As part of his findings, Dr. Bradford stated:

"The most critical thing, to this examiner, is the level of his pornography usage, whether it is through or whether it might return or cause impulsive or poor behaviors toward the children. Also, there is the question of what the children might be exposed to.... [Father] might say that although he viewed pictures, he would not act any further than that. Experts on addiction would often say that the viewing of increasingly bad pictures is part of moving from one stage to another in addiction. Whether he would act or not on the fantasies, is not clear from our data."

To deal with the problem, Dr. Bradford recommended:

"[O]ngoing therapy for [Father] to deal with all the issues he has had with depression, pornography, relationships, vocational issues, child visitation and care issues, etc. It would be most important to have a therapist who is very familiar with pornography addiction, who could testify or vouch for him that he is making progress and that might be willing to say that he has had enough treatment that he would pose no risk for visitation, extended visitation, short trips, eventually possible joint custody, etc.

. . . .

"Short visits seem to be occurring at this time and that seems appropriate, but then again the situation and emotions of the children should be further investigated to further explore how that might be going. *Further interviews of the children by the therapist and investigation of how the children are doing in therapy with Leslie Brown would be an important part in understanding the needs and thoughts of the children in this case.*"

The therapist mentioned in Dr. Bradford's report, Leslie Brown, began seeing Hayley in October 2001. Hayley's counseling resulted from her exhibiting behavioral problems such as being physically aggressive and masturbating in public. The first time Brown witnessed Hayley's anger problems was after a meeting with Father in April 2002. At this meeting, Brown recommended to Father that Hayley was not ready for overnight visitations. When Hayley found this out, Hayley "raged, was absolutely furious, intensely so, and that rage continued week after week after week, escalating into absolutely calculating, vicious attacks." Apparently, Hayley did not want Father to know that she did not want to go on overnight visits. In December 2002, Hayley related to Brown that she "acted out" because she believed doing so would equate to less visitation time with Father.

In her opinion, Brown believed that Hayley had an overwhelming fear of Father because she was confused on whether he molested her and because Father was an extremely angry person. A Division of Family Services investigation into the molestation allegation resulted in a finding of "no probable cause" and Brown stated that

she was unsure if the abuse occurred. Father, of course, denied any wrongdoing. We will further address these issues in our discussion of Points II and III.

In 2004, Father's visitation with the children changed to supervised contact for two hours per week and Hayley's behavior improved. Brown testified that Hayley is "totally convinced that if somebody were not watching, that [Father] would be scary again."

Ultimately, Brown and the guardian ad litem appointed by the court recommended that Father only be allowed supervised visits with Hayley and Garrison. The trial court agreed, finding unsupervised contact with Father would harm the children physically and emotionally. As such, Father was given supervised visits for one hour per week with the children.

The supervised contact stemmed, in part, from Dr. Bradford's recommendations and Father's cavalier attitude toward the situation. For instance, Dr. Bradford claimed that Father needed ongoing treatment for his pornography problem, and "one concern we currently have is, in terms of treatment, he seems to be going as little as possible ... not as much as possible." Even in light of Dr. Bradford's evaluation, Father testified at the dissolution trial that he "never had a problem with child pornography," even though he actively sought such materials on the Internet. Moreover, Father told the court

that he refused any sort of continued therapy for his problem.

At this point, we refrain from further discussion of the facts as the above presents a sufficient overview. Other facts and pertinent parts of the judgment will be discussed further in addressing Father's points on appeal.

### Point I: Conditioning Visitation on Payment of Therapy Costs

Father's first point maintains the trial court committed reversible error when it decreed he could not visit his children "[u]ntil or unless" Brown was paid for past therapy sessions and any future visitation would stop if he "fail[ed] to pay ... Brown for future therapy for Hayley." Several parts of the trial court's judgment must be considered in deciding this claim of trial court error.

First, Mother was ordered to maintain health and dental insurance for the children, but Father was required to pay any "medical, dental, orthodontia, *psychological and psychiatric expenses* ... for the ... children, which are not paid for by [Mother's] insurance." (Emphasis supplied.) Second, the trial court allowed Mother a Form 14 credit of $223 for health insurance costs. Third, the court allowed Mother a $174 per month credit for other extraordinary child rearing costs per Line 6e of Form 14. Mother testified the $174 figure represented monthly therapy costs for Hayley.[3] Fourth, the trial court used a

---

3. At one point Mother testified the $174 monthly "extraordinary child rearing cost" item on line 6e of Form 14 was "the cost for therapy with Leslie Brown." Later, when asked if any other expense was part of this $174 cost item, Mother answered, "Off the top of my head, having to recall so far back, I cannot tell you." In her brief, Mother seems to concede Hayley's therapy cost was $174 per month. However, other evidence suggests that the psychologist's bill for Hayley was $90 per week and Mother only wanted

Father to pay one-half of Brown's charges. Such confusion, not only about this but on other evidentiary items, is understandable when as here, a case is started in early March 2004 but not completed until December 2004. We understand that overcrowded trial dockets and scheduling difficulties abound, yet the ever-increasing practice of partially trying domestic relations cases and then recessing them for extended periods is a too frequent source of problems for the trial court, liti-

separate paragraph to order Father to pay past and future therapy costs for Hayley and ruled that if Father failed to pay these costs to Brown, all visitation with the children would immediately cease until Father was current on the payments.[4]

In his brief, Father concedes the trial court had authority to order him to pay Brown's fees; he argues, however, that "it is clearly *not* appropriate for the trial court to base a parent's ability to see his children on the payment of those fees." This court agrees.

■ A redundancy exists in this judgment regarding Father's obligation to pay Brown's expenses. This is so because the separate order is for expenses already included—at least in part—in the child support payment calculation. *See Gordon v. Gordon,* 924 S.W.2d 529, 536 (Mo.App. 1996). Granted, the redundancy is otherwise irrelevant in our analysis of Point I, yet we reference it to emphasize that Father's obligation to pay any or all of Brown's therapy charges is simply a part of his *child support* obligation. This is true whether payment of Brown's services for Hayley was ordered as part of the Form 14 child support calculation or as a separate item of support per section 454.633.3.

■ With that said, we are persuaded that the trial court exceeded its authority when it conditioned Father's visitation with his children on the payment of child support, i.e., on payment of Brown's therapy charges for Hayley. We find support for this in the following.

The General Assembly of Missouri, via section 452.375.4, has declared it to be "the public policy of this state that frequent, continuing and meaningful contact with both parents" after dissolution of marriage "is in the best interest of the child." In a similar vein, section 452.365 provides that "[i]f a party fails to comply with a provision of a decree ..., the obligation of the other party to make payments for support ... or to permit visitation is not suspended but he [or she] may move the court to grant an appropriate order." For instance, if Father failed to pay the Form 14 part of his child support obligation, the remedy for Mother was to move the court to grant an appropriate order, not suspend visitation. *Kessinger v. Kessinger,* 829 S.W.2d 658, 660 (Mo.App.1992); *State ex rel. Williams v. Williams,* 647 S.W.2d 590, 593[5] (Mo.App.1983).[5]

■ The trial court here clearly had authority to include Brown's fees as part of Father's child support obligation. *See Foraker v. Foraker,* 133 S.W.3d 84, 97–98 (Mo.App.2004); *Kirkwood v. Kirkwood,* 77 S.W.3d 675, 686 (Mo.App.2002). What it did not have was the authority to empower Mother to unilaterally suspend Father's visitation rights by claiming he had not paid this part of his child support obligation. In effect, the judgment purports to authorize Mother to do what section 452.365 strictly prohibits, namely, prohibit future visitation for nonpayment of support. We hold that the court lacked au-

---

gants, their attorneys, and for appellate courts.

4. Presumably, the separately ordered payment of therapy costs by Father was based on section 454.633.3. That statute provides in pertinent part:

"As between parents, responsibility for the child's care expenses that are not covered by a health benefit plan may be equitably

apportioned between the parties by the court ... in percentage shares based on their income...."

5. The phrase "Form 14 part of his child support obligation" refers to the "presumed child support amount" calculated pursuant to Civil Procedure Form No. 14 as referred to in Rule 88.01.

thority to sanction Father for nonpayment of child support in this fashion. That part of the judgment is reversed.

We turn next to Father's contention that the trial court erred when it ordered that he cannot visit the children until he pays Brown's past due fees. Although this is not the same situation as the future child support issue discussed above, we find it analogous and hold the trial court lacked authority to enter that order. We do so, not only for the public policy reasons expressed in sections 452.365 and 452.375.4, but also based upon *Mansell v. Mansell,* 583 S.W.2d 284 (Mo.App.1979).

In *Mansell,* the trial court conditioned the noncustodial parent's right to visitation on the payment of a $1,500 bond to ensure that she would return the children from California after the visitation period ended. *Id.* at 285. The *Mansell* court found the $1,500 bond to be an "unauthorized condition" on the exercise of visitation rights. *Id.* at 288[6]. Here, the condition that Father pay this child support payment "up front" before visitation can be had is a similar "unauthorized condition."

In so holding, we recognize there is statutory and case authority for requiring prepayment of certain fees as a prelude to supervised visitation.[6] *See Reding v. Reding,* 836 S.W.2d 37, 42 (Mo.App.1992). The *Reding* court reasoned that if the need for supervised visitation is proven, then such visitation "would necessarily require payment of expenses for supervision." *Id.* at 42[5]. Moreover, *Reding* ruled that a trial court has "broad discretion in apportioning the expenses of exercising child custody rights[ ]" and that such discretion was not abused by ordering the visiting parent to pay supervision costs up front. *Id.* at 42–43[6].

That is not the same as requiring a parent to pay some part of child support as a prelude to visiting. There is no analogous statutory empowerment of a trial court to condition the exercise of visitation rights on the payment of child support as there is in paying for supervision expenses.

In sum, the trial court erred when it required Father to pay the therapy part of his child support obligation, past or future, as a prelude to exercising his visitation rights. The trial court had no such authority. Father's first point is granted.

### Points II and III: Supervised Visitation Issues

In his second and third points, Father argues the evidence was insufficient to support that part of the trial court's judgment which limited his contact with the children to one hour of supervised visitation each week. We disagree.

The paramount concern in child custody cases is whether the trial court's order serves the best interest of the child. *In re Snoke,* 913 S.W.2d 407, 408–09[2] (Mo.App.1996). We will affirm the trial court's decision unless we are firmly convinced the welfare of the children requires some other disposition. *Snoke,* 913 S.W.2d at 409[3].

A trial court shall not order supervised visitation unless it finds that the visitation would endanger the child's physical health or impair his or her emotional development. § 452.400.1–2; *Robinson v. Robinson,* 128 S.W.3d 543, 547 (Mo.App. 2003). Appellate courts give great deference to a trial court's assessment of the best interests of the child "because it is in the better position to judge the credibility of the witnesses, as well as their sincerity, character, and other intangibles not completely revealed by the record." *Snoke,*

---

**6.** Section 452.400 authorizes supervised visi- tations when prescribed circumstances exist.

913 S.W.2d at 409. "This deference is critical in domestic cases, where testimony is often sharply divergent and lawyers are prone to reargue the facts on appeal." *Id.*

Father's second point challenges the sufficiency of the evidence as it pertains to the visitation order regarding Hayley. In that vein, we note the evidence overwhelmingly supports the trial court's judgment restricting Father's visitation. First and foremost, Dr. Bradford stated that, as the matter stood, Father posed a risk to both children due to his preoccupation with pornography. This, however, was not the only supportive evidence of the trial court's judgment. Other evidence supports the judgment and conclusion, specifically, Brown's testimony.

In describing her sessions with Hayley, Brown related the following. Hayley possessed an unusual fear of her Father and was terrified of overnight visits. In part, this fear stemmed from her perception of whether Father molested her. Hayley related to Brown that Father "massaged my privates." At other times, she characterized Father touching her as "checking for ticks." But, Hayley also stated that Father "touched me besides checking for ticks."

Similarly, in a July 2003 therapy session, Hayley told Brown: "I'm nervous sometimes when I'm with dad. And the touching thing, I'm not sure really that he won't do that again. I don't think he will, but he might, but I'm not sure. I kind of think he's weird for doing that." In a February 2004 session, Hayley related: "I'm hiding something about daddy, but I don't want him to get in trouble. I decided that a long time ago. Then I forgot it. I think—I just get a bad feeling about daddy."

Father has denied the sexual abuse allegations. A DFS investigation resulted in a finding of "no probable cause." Brown also testified that there was inadequate evidence to determine if Hayley had been abused by Father. Father heavily relies on the so-called lack of abuse evidence to argue that contact with him is not harmful.

Whether it can be proven that Father molested Hayley is not the issue. The issue is that Hayley believed "something" wrong happened. Father refused to acknowledge this fact. Brown opined that if Father discussed the problem with Hayley, then progress *might* be made. This has not occurred. Because of this failure, Hayley "can't just put it away and be done with it, and that has caused her emotional duress." That emotional harm was directly caused by Father.

At the end of the hearings, the family court commissioner pointed out this lack of effort by Father:

> "I've got about thirty years of observation both as a practicing attorney for two decades and eleven years on the bench and—and I don't believe I've—I have not heard any testimony that was more disturbing, more aberrant, than what I've heard with regard to the strange behavior of Hayley.
>
> . . . .
>
> "I don't think it would have been inappropriate for [Father] to have been more proactive in communicating with Ms. Brown, saying, you know, 'This is a terrible thing. This is a terrible situation. My daughter's behavior that you're observing is absolutely off-the-wall and concerns me a lot. Let me help however I can. Can I—Tell me how I can participate.' I don't see that kind of a proactive approach."

Instead of trying to help his daughter, Father chose to do nothing. If Father had attempted to help Hayley, she might not be so emotionally troubled. For this reason alone, the requirements of section 452.400.1–2 have been met and a super-

vised visitation order was proper with regard to Hayley.

This type of emotional harm, however, does not stand alone. Other evidence pertaining to Hayley and Father must be discussed because it will be shown how this negatively affected Garrison, which is the focus of Father's third point. In that point, Father argues the evidence was insufficient to support the court's judgment limiting his contact with Garrison to supervised visitation. Father claims there is simply no evidence that Garrison has been harmed in any way by contact with Father. Again, we disagree with that notion.

Dr. Bradford found that Father suffered from a personality disorder with strong narcissistic tendencies. This personality disorder has taken its toll on Hayley. For instance, Brown testified that narcissists typically have many anger issues, and Hayley confirmed that fact about Father in sessions with Brown. This anger manifested itself causing Hayley to be further fearful of Father.

Because she feared Father and because he demanded perfect behavior of her on visits, Hayley tried to meet Father's expectations. However, Hayley also had deep-seated anger and resentment toward Father, and she bottled this inside herself for fear of displeasing Father. After visits, this rage and anger was let loose on those around her, namely, Mother, Garrison, and Brown. More than this, Hayley modeled her rage after Father's behavior. Brown opined that Hayley's behavior at home was, in turn, having a negative effect emotionally on Garrison. In this indirect way, Garrison has been harmed by Father, who has done nothing to improve the situation.

Father seemingly argues that, even if contact with Hayley should be limited, no evidence supports limiting time with Garrison. Father claims that all problems revolve around Hayley and this fact should not impact his visitation with Garrison. What Father fails to comprehend is that if visits were split, the relationship between Hayley and Garrison would likely worsen, and possibly destroy any sibling ties.

Given all of these negative factors, we believe the trial court's judgment of supervised visitation is fully supported by the record. We would be remiss, however, if we failed to mention one final problem preventing Father from exercising unsupervised contact with the children in his home. That involves his addiction to or problem with child pornography.

At one point, Father began seeing a psychologist for various issues including viewing pornography over the Internet. He stopped seeing this counselor with no intentions of continued counseling. Father admitted that he viewed child pornography on the Internet and masturbated while doing so. This occurred while Hayley was present in the home. At trial, Father inexplicably claimed that he has never had a problem with child pornography. As Father's former counselor aptly stated, narcissists are less likely to admit they have a problem which is the necessary first step in dealing with an addiction.

Because Father obstinately refused to acknowledge his problem with child pornography, it is not a great leap or inference to conclude that this problem could pose risks to Hayley and Garrison in the future if they visited unsupervised in his home. For this additional reason, we cannot say the trial court's judgment limiting Father's contact with the children was wrong.

We are not firmly convinced that the welfare of the children requires some other disposition. *Snoke*, 913 S.W.2d at 409[4]. The trial court's judgment is supported by substantial evidence, it is not

against the weight of the evidence, nor does it erroneously declare or apply the law. *Robinson,* 128 S.W.3d at 546. Point denied.

### Point IV: Division of Marital Property and Debts

Father's fourth point maintains the trial court erred when it ordered him to pay $20,500 to Mother in order "to make more equitable the division of property." This point has merit.

The trial court's $20,500 equalization figure was apparently arrived at as follows. The court classified as marital property the parties' residence and personal property listed on Exhibit "E" and valued it at $111,025. This was awarded to Mother. Also, the court assigned to Mother as marital debts the house mortgage ($61,291) and a debt Mother owed to a family member ($16,900). Accordingly, the net marital property award to Mother (sans equalization award) was $32,834.

The court listed on Exhibit "F" the award to Father as his share of marital assets.[7] This property was valued at $75,264. Included in this list were cattle sales proceeds, valued at $10,800.[8] Regard-

ing Father's responsibility for marital debts, the court took a two-step approach. First, it assigned a $1,515 Discover credit card debt to Father and used it to calculate Father's net marital property award ($75,264 less $1,515 = $73,749). Then, without considering other marital debts it assigned to Husband, the court looked at the difference between the parties' respective marital property awards ($73,749 for Father and $32,840 for Mother). Based on that asserted discrepancy, the court ordered Father to pay Mother $20,500 "to make more equitable the division of property."

The second part of marital debt assignment to Father was an order that Father was to pay debts totaling $62,299 that were not used in calculating his *net* marital asset distribution. These debts consisted of $45,599 in credit card accounts and $17,000 listed as a debt on a Honda van.[9] The court explained its ruling as follows:

> "[Father] incurred these above debts after the date of separation without [Mother's] knowledge and in violation of the Court's Interim Domestic Order, which the Court determined by the evi-

---

7. As with other exhibits attached to the judgment, Exhibit "F" was incorporated by reference as a part of the judgment.

8. On appeal, he complains it was wrong for the trial court to put the sale proceeds on the asset side of his marital property award. We disagree. There was evidence that the parties owned the cattle at the time of separation, Father sold the cattle, they had a value of at least $10,800, and Mother never received any of the sale proceeds. Although Father gave varied explanations about both the ownership and what happened to the sale proceeds, "[a] trial court does not have to specifically find that it believes monies have been secreted or squandered in anticipation of divorce, because its action can imply such a conclusion where sufficient evidence exists to support the conclusion." *Loomis v. Loomis,* 158 S.W.3d 787, 791[7] (Mo.App.2005). That is the situa-

tion here. Moreover, the trial court was free to disbelieve Father's testimony on this issue and his vague and unsupported assertions that part of the cows belonged to his father and that other proceeds from the sale of livestock went entirely to pay expenses. *Id.* at 790–91.

9. There were two other debts assigned to Father that the court did not use in its net marital asset distribution; a $34,000 attorney fee award to Mother and a $9,631 unpaid balance on the guardian ad litem's fee and Brown's account. The omission of these two items from the marital asset/marital debt analysis did not contribute to the "equalization order" error. This follows because "an award of attorney fees is not part of the division of marital property and should not be considered in the propriety of the division." *Foraker,* 133 S.W.3d at 105–06.

dence presented that these debts were incurred at [Father's] sole discretion, include expenses incurred on behalf of [Father's] extramarital affairs, and include in part [Father's] attorney fees and [Father's] portion of Guardian ad Litem fees, including orders of contempt. *These debts were not included in the division of marital property in determining the equity of the distribution of the property and debt of the parties.*" (Emphasis supplied.)

In effect, the court ordered Father to make an equalizing payment by creating a fictional difference between the two net marital asset awards. It did this by ordering Father to pay marital debts without using those debts in calculating Father's net marital asset amount. This was a misapplication of the law.

Section 452.330.1 mandates that in a dissolution of marriage case "the court shall ... divide the marital property and *marital debts* in such proportions as the court deems just after considering all relevant factors." (Emphasis supplied.) A trial court has no discretion or leeway to leave out of its analysis any marital property or marital debt when deciding what is a fair and equitable division thereof. "Marital debts are to be considered when establishing a fair distribution of the marital property." *Travis v. Travis*, 63 S.W.3d 296, 298 (Mo.App.2001). The inclusion of both marital property and marital debts as part of the "just basis" analysis is inexorably commanded by section 452.330.1. *Bean v. Bean*, 115 S.W.3d 388, 393 (Mo.App. 2003). This does not mean, however, that property and debt division have to be equal; the only requirement is that they be fair and equitable and take into account all relevant factors, including those listed in section 452.330.1. *Id.* at 393[6].

As a reviewing court, we ordinarily assume the trial court considered all

the evidence when it divided the marital property and marital debt. *Id.* The problem here, however, is that the trial court specifically stated it did *not include* over $45,000 of marital debt *in determining the equity of the distribution of the property* and then used that omission as the basis for its $20,500 equalization order. In doing so, the court committed reversible error.

We hasten to add that the trial court's rationale for ordering Father to pay these debts is sound. Father had affairs, Father violated court orders, Father was a spendthrift, and the list could go on. We do not disagree that Father should be required to pay these marital debts. Nor do we intend that our reversal of this "equalization award" be read as precluding an equalization payment on remand, nor as an intimation that a just division of marital assets and marital debt would necessarily mean an equal division of net marital assets. We simply cannot find authority for excluding the subject marital debts in deciding what is a just division.

This court sympathizes with the trial court's dilemma in fashioning a just distribution of marital assets and debt without adequate evidence showing why Father had the large credit card debts, without evidence of what Father did with his sizeable income, and without evidence of the outcome, if any, of Father's threatened bankruptcy. We anticipate these and other evidentiary failings will be addressed upon remand.

For the reasons stated, we find Point IV has merit. We reverse that part of the judgment that ordered Father to pay Mother $20,500 and remand for further proceedings regarding all aspects of the division of marital property and marital assets.

### Point V: Child Support Issue

■ Father's fifth point maintains the court erred in setting his child support obligation at $1,890 per month. In part, he argues for reversal because (1) there was no evidence to support the amount of income imputed to him by the court, and (2) the Form 14 calculation was erroneous because it included $174 on Line 6e thereof for an item that he was ordered to pay via a separate provision in the decree (Brown's charges for Haley's counseling). These arguments have merit.

The trial court imputed income to Father in the amount of $7,587 per month. Mother concedes in her brief there was insufficient evidence to support the $7,587 monthly income figure that the trial court imputed to Father. She claims that the correct amount imputable to Father is $7,193 per month. Father disagrees, saying that the evidence only supports an imputed income of $6,600 per month.[10]

Despite Mother's admission that the trial court erred in imputing a $7,587 monthly income to Father, she urges that we not reverse. This is based on her claim that $7,193 is the correct amount to be imputed and that the difference between child support based on $7,587 per month and $7,193 per month is "de minimis." As authority for this notion, she cites *Franke v. Franke*, 913 S.W.2d 846 (Mo.App.1995). There, the trial court imputed income to the father of $11,400 per month and ordered him to pay $1,249 per month in child support. *Id.* at 850–51. At the time (1994), the Form 14

guidelines did not encompass incomes in the $11,400 per month range. On appeal, the father argued that a $42 per month miscalculation by the trial court regarding mother's income "fundamentally flaw[ed] the entire child support award" and should result in reversal. *Id.* at 851. The *Franke* court disagreed, holding that it would not disturb the child support award for such a small miscalculation. *Id.* Those are not the facts of this case.

First, we cannot discern how the court here arrived at the $7,587 monthly income it imputed to Husband. As such, we can only speculate whether the court intended to impute income to Husband based on the evidence most favorable to him, least favorable to him, or somewhere in between. Second, even if we accept Mother's argument that $7,193 per month is the amount that should be imputed to Father, the result would be a $70 decrease in Father's out-of-pocket expenses each month. We would be hard pressed to hold that this $70 difference was de minimis for a person currently grossing only $1,200 per month (albeit capable of earning substantially more). Third, there is another error in the child support decision, specifically, the redundancy in the "therapist cost" portion of the child support award. That is a factor not present in the *Franke* case. On this record, we cannot characterize the errors as "de minimis." Father's fifth point has merit. We reverse and remand that part of the judgment relating to Father's child support obligation.[11]

---

**10.** Father currently earns $1200 per month. The court imputed income to Father on the basis of his previous employment, which Father voluntarily quit. Father argues that the court should not have considered a "flex credit," which is apparently some type of "health insurance benefit," when it imputed income. This argument appears to be without merit. *See Farr v. Cloninger*, 937 S.W.2d 760, 764 (Mo.App.1997); *Fulton v. Adams*, 924 S.W.2d

548, 554 (Mo.App.1996). However, evidence on this issue is scant at best; consequently, the trial court may wish to reconsider it on remand and hear additional evidence.

**11.** On remand, the trial court is free to hear additional evidence on the child support issue including, but not limited to, (a) clarifying evidence regarding "flex plan" benefits mentioned on Father's pay stubs, i.e., to learn if

### Point VI: Retroactive Child Support

Father's sixth point complains there was no evidence to support the trial court's order that he pay child support retroactive to November 2002 in the amount of $1,890 per month. Mother concedes that "there is no evidence showing that [Father] earned an income in 2003 and the end of 2002 that was similar to the income used on the Form 14 to calculate [Father's] retroactive child support obligation." With that concession made, Mother asks that "the issue of retroactive child support from November 2002 through 2003 be remanded to the trial court to determine an accurate Form 14 for that ... period." Based on this request and the lack of evidence to support what the trial court found on this issue, we grant Father's sixth point. The retroactive child support part of the judgment is reversed and remanded.

### Point VII: Attorney Fee Issue

Father's final claim of trial court error relates to its award of attorney fees to Mother. Father argues the trial court abused its discretion when it ordered him to pay $34,000 to Mother for her legal expenses. He insists, *inter alia,* that the judgment created such a huge financial disparity between Mother and him that to order Father to pay Mother's attorney fees was an abuse of discretion.

In most circumstances, parties to a dissolution case are responsible for their own attorney fees. *Silcox v. Silcox,* 6 S.W.3d 899, 905[17] (Mo.banc 1999). Even so, trial courts are authorized by section 452.355.1 to award reasonable attorney fees in some dissolution cases. *Adair v. Adair,* 124 S.W.3d 34, 40 (Mo.App.2004).[12]

We note, however, that section 452.355.1 permits but does not require an award of attorney fees. *In re Marriage of Baker,* 986 S.W.2d 950, 958[16] (Mo.App. 1999). Thus, an attorney fee award per section 452.355.1 is not one of unregulated discretion. In ruling a party's request for attorney fees in a dissolution case the trial court must consider all relevant factors, including the financial resources of the parties, the merits of the case, and the actions of the parties during the pendency of the action. *Bean,* 115 S.W.3d at 397; § 452.355.1. In addition to specific factors listed in section 452.355.1, evidence that a litigant increased marital debts during the pendency of a case in direct violation of a court order is a factor supportive of an attorney fee award. *Bean,* 115 S.W.3d at 397.

Here, the judgment recites that the trial judge had "taken all relevant factors into consideration" in dividing marital property and debt and in adjudging custody and visitation. There is no such recital regarding the attorney fee award. In so stating, we are mindful that a trial court's ruling of attorney fee issues is presumptively correct. *In re Marriage of Michel,* 142 S.W.3d at 927. This is a corollary to the presumption that trial judges know and follow the law. *C.A.W. v. Weston,* 58 S.W.3d 909, 914 (Mo.App.2001). The problem here is that those presumptions are countered by the fact that the

---

those benefits are includable as income; (b) current evidence about Mother's work situation and potential imputable income to her; (c) clarifying and updating evidence about the cost of Hayley's therapy sessions; and (d) any other evidence relevant to the latest child support schedule that was implemented in 2005.

12. We stress "reasonable attorney fees" because "[a]ll case law emphasizes the broad discretion of the trial court to award all, some, or none of the amounts billed by counsel." *B.J.D. v. L.A.D.,* 23 S.W.3d 793, 800 (Mo.App.2000). A trial court "is not obliged to rubber stamp counsel's billings." *Id.* at 800[23].

trial court created a fictional, understated net marital asset distribution for Father. We cannot tell how heavily, if at all, this error influenced the trial court as it weighed the financial resource part of the attorney fee issue. What we do know is that the financial resource factor is a significant one here. This is so because of Father's heavy debt load and because the evidence is mixed that Father's conduct during the marriage or during the pendency of the case contributed to increased attorney fees for Mother. For the most part, he candidly admitted most of his pre-separation and post-separation misconduct; consequently, Mother did not have to expend attorney fees to prove what he admitted. On the other hand, his misconduct weighed heavily in deciding custody issues and occupied large amounts of attorney hours. Thus, the financial resource factor and evidence that Father increased marital debts during the pendency of the case in direct violation of a court order are the principal factors revealed by this record that are supportive of an attorney fee award.

■ Mindful that a trial court is vested with broad discretion in making an attorney fee award and that we will only reverse if the trial court abused that discretion, *Silcox,* 6 S.W.3d at 905[18], we are not persuaded that reversal is mandated here. On the other hand, we are not persuaded we should affirm due to the uncertainty about whether the trial court used its erroneous net marital asset calculation as a deciding factor in its attorney fee analysis. Because the case is being reversed and remanded to resolve other issues, we also remand for reconsideration of the attorney fee issue.

We reverse that part of the judgment that conditioned Father's visitation on payment of the counselor-therapist's fees; we reverse and remand the part of the judg-

ment that addresses child support and division of marital assets and marital debts; we remand for reconsideration that part of the judgment that deals with attorney fees; and in all other respects, we affirm the judgment of the trial court.

BARNEY, J., and BATES, C.J., concur.