Stephen A. DAVIS, Appellant,

v.

Victoria C. SCHMIDT, Respondent;

E.G.D., Respondent.

Nos. WD 65517, WD 66039.

Missouri Court of Appeals, Western District.

Jan. 9, 2007.

Patricka Michael Davis, Kansas City, Mandee Simone Rowen, Kansas City, for Appellant.

Jacki Sue Harmon Breen, Kansas City, for Respondent Schmidt, Bradley P. Grill, Kansas City, for Respondent E.G.D., for Respondent.

RONALD R. HOLLIGER, Judge.

In this consolidated appeal from a judgment of dissolution of marriage of Stephen A. Davis ("Father") and Victoria C. Schmidt ("Mother"), Father contends that the trial court erred in various respects in its custody determination, the parenting plan, the child support order, and in the

attorney fee awards for trial services and on appeal. Father challenges the court's amended judgment, raising six points claiming error in the failure to make required findings, that the judgment is incorrect and unwarranted on the merits, and other points relating to attorney fees and recusal by the judge. We reverse and remand for further proceedings.

We take Father's points out of order since the failure to make required findings necessitates reversal. We address the other points relating to custody and child support only as we may provide some direction upon remand but without directing our opinion on the merits. We address the two attorney fees issues and the complaint that the trial judge should have recused himself separately.

## FACTS AND PROCEDURAL HISTORY

Father and Mother were married on November 23, 2002, in Weston, Missouri, where Mother lived prior to their marriage. In December 2002, Mother informed Father that she was pregnant. At the time of the marriage Father apparently lived in Wichita, Kansas, and the parties were subsequently unable to agree on where they would make their permanent residence. Father filed his Petition for Dissolution of Marriage on May 16, 2003, which requested that the parties be granted joint physical and legal custody of their unborn child, as well as an award of attorney fees from Mother. The parties' minor child, Emma, was born on July 18, 2003.

In October 2003, Father filed a First Amended Petition seeking sole legal and physical custody of Emma with reasonable rights of visitation to Mother. Mother filed her answer and first amended counter-petition, in which she denied Father's allegation that it was in Emma's best interests that he receive sole legal and physical custody and asked that Mother and Father share joint legal and physical custody. In May 2004, when Emma was about seven months old, Mother and Father entered into a pendente lite stipulation for temporary custody and visitation providing that they share joint legal custody of Emma, as well as joint physical custody, on an equal (50–50) basis, alternating every two weeks. This temporary custody arrangement remained in place for the next nine months, until the trial court issued its judgment decree of dissolution of marriage.

Trial began in July 2004. Before the introduction of any evidence, Mother and Father submitted a property settlement agreement making a division of all debts and assets, marital and non-marital, which was approved by the trial court. Because Father alleged abuse and neglect of Emma by Mother, the trial court suspended all proceedings and appointed Brad Grill as guardian ad litem for Emma. Father then filed his second amended petition seeking to restrict Mother to supervised visitation because she had allegedly neglected to provide proper care, supervision, and hygiene for Emma and exposed her to unsanitary conditions at Mother's home. Mother denied those allegations of abuse and neglect, and trial resumed over three days in January 2005. The court entered a judgment in February finding that it was in Emma's best interests for Mother and Father to exercise joint physical and joint legal custody of Emma, with Mother's residence designated as her address for mailing and educational purposes. With two additions, the court adopted one of the two parenting plans submitted by Mother as being in Emma's best interests. The judgment also awarded Mother $1,090 per month in child support based on the Form 14 she had submitted and incorporated the parties' previous property settlement

agreement. The court denied Father's request for an award of attorney fees and expenses, ordered him to pay $11,000 of Mother's trial-related attorney fees and expenses, and assessed costs of the action against Father. Each party was also ordered to pay a portion of the guardian ad litem fees.

On March 18, 2005, Father filed a post-trial motion seeking reconsideration and asking that the judgment be amended to supply missing and required or requested findings of fact, which we will henceforth refer to as Father's motion for new trial. After a hearing the trial court overruled the motion, granted Mother's motion for additional attorney fees in of $1,000 and amended its judgment with two minor changes not relevant to these appeals. Later Mother filed a request for appellate fees and expenses. After a hearing, the court awarded Mother $25,000 in appellate legal fees and $750 in expenses.

Father timely filed notices of appeal as to both final judgments, leading to this consolidated appeal. All other pertinent aspects of the factual and procedural history of this case which are necessary to resolve Father's appeals are set forth in our analysis below.

## POINTS ON APPEAL

### The Lack of Required Findings

For clarity and logic we address the points on appeal out of order. In his third point, Father argues that the trial court's custody award was the product of an erroneous application of the law. In particular, he contends that the court made insufficient findings from which this court can reasonably review the correctness of the court's judgment as to custody, including whether the court complied with its statutory mandate to "determine custody in accordance with the best interests of the child" as required by section 452.375.2, as well as whether as it was unsupported by substantial evidence or was against the weight of the evidence. We must agree.

■ Under section 452.375.6, where "the parties have not agreed to a custodial arrangement, the court [is] required to include in its judgment a written finding based on the public policy in section 452.375.4 [1] and the factors listed in section 452.375.2(1) to (8),[2] detailing the specific

---

1. Section 452.375.4 states:
 [I]t is the public policy of this state that frequent, continuing and meaningful contact with both parents after the parents have separated or dissolved their marriage is in the best interest of the child, except for cases where the court specifically finds that such contact is not in the best interest of the child, and that it is the public policy of this state to encourage parents to participate in decisions affecting the health, education and welfare of their children, and to resolve disputes involving their children amicably through alternative dispute resolution. In order to effectuate these policies, the court shall determine the custody arrangement which will best assure both parents participate in such decisions and have frequent, continuing and meaningful contact with their children so long as it is in the best interests of the child.

2. Those factors are:
 (1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;
 (2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;
 (3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;
 (4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;
 (5) The child's adjustment to the child's home, school, and community;
 (6) The mental and physical health of all individuals involved, including any histo-

relevant factors that make the chosen arrangement in the best interest of the child." *Buchanan v. Buchanan,* 167 S.W.3d 698, 701–02 (Mo. banc 2005). In other words, as pointed out by Father in his motion for new trial and acknowledged by Mother in her brief, "if the parties have not agreed to a custodial arrangement, the court must include a finding as to the matter of frequent, continuing, and meaningful contact with the parents, and also a finding *detailing* the *specific relevant factors* that made a particular arrangement in the best interest of the child." *Huber ex rel. Boothe v. Huber,* 174 S.W.3d 712, 716 (Mo.App. W.D.2005) (emphasis added). "So long as any issue or sub-issue of custody is subject to contest between the parties and resolution by the court, written findings that include *discussion* of the applicable factors from section 452.375.2 are required." *Buchanan,* 167 S.W.3d at 702 (emphasis added).

■■■ While the trial court need not discuss factors that are not relevant, it is required to discuss those that are. *Huber,* 174 S.W.3d at 716. "The purpose for the statutory requirement to detail the factors is to allow for more meaningful appellate review." *Id.* If the required findings are not made, we must reverse the custody award and remand to the trial court for its entry of such findings, "as the burden is upon *the court* to issue [proper] written findings." *Id.* at 717 (emphasis added); *see also Bauer v. Bauer,* 38 S.W.3d 449, 456 (Mo.App. W.D.2001).

Father argues that the findings made by the trial court here did not meet those standards, as they "failed to state any [factual] basis for [its] conclusions," there-

by preventing a "full, meaningful opportunity for appellate review." In her brief, Mother concedes the trial court had a duty to issue such findings, but contends, without any citation of authority, that its cursory conclusions of law were sufficient to satisfy that obligation.

We addressed this very issue in the recent case of *Schlotman v. Costa,* 193 S.W.3d 430 (Mo.App. W.D.2006). In *Schlotman,* the father timely filed a motion to amend the court's original judgment, arguing that the trial court failed to include necessary findings required by statute. *Id.* at 432. The court then issued an amended judgment. *Id.* On appeal, this court found that even the amended judgment did "not contain any findings of fact" as to any of the relevant best interests factors in section 452.375.2 or the public policy in section 452.375.4. *Id.* at 433. All the amended judgment contained was an exhibit titled "Section 452.375 Summary of Relevant Factors," which was incorporated into the judgment. *Id.* We described the contents of this exhibit as follows:

> The incorporated exhibit consisted of a checklist of the best interest factors of 452.375.2. Next to the list of factors were two columns, one for Mother and one for Father. The trial court marked each factor in favor of Mother or Father, presumably depending upon which factor weighed in favor of the particular parent. There was no other discussion on whether the proposed relocation was in the best interests of the children.

*Id.* We then held that these findings did "not allow meaningful appellate review," and reversed and remanded because the absence of findings left this court unable to

ry of abuse of any individuals involved . . .;
(7) The intention of either parent to relocate the principal residence of the child; and

(8) The wishes of a child as to the child's custodian.

reach the issue of whether the decision was against the weight of the evidence. *Id.* at 433–34; *see also Huber,* 174 S.W.3d at 717 (declining to attempt appellate review in the absence of proper written findings on the factors in section 452.375.2 since "[o]ur ability to review the judgment and consider the weight of the evidence is hindered by the lack of findings.").

■ The judgment here utilizes the same type of summary "checklist" used in *Schlotman,*[3] which did not contain any discussion or factual detail, but merely a series of "X" marks in a column. The court's judgment, therefore, prevents any meaningful appellate review of Father's claims on appeal and must be remanded for those findings and entry of an award of custody in accordance therewith, as properly supported by the evidence presented at trial. *Schlotman,* 193 S.W.3d at 434; *Bauer,* 38 S.W.3d at 456.

■ Father further argues the court also erroneously applied the law in failing to make findings as to why it rejected his proposed custodial arrangement in favor of the one proposed by Mother.[4] He cites a different part of section 452.375.6, which states that "[i]f a proposed custodial arrangement is rejected by the court, the court shall include a written finding in the judgment or order detailing the specific relevant factors resulting in the rejection of such arrangement." Although the court rejected Father's proposed custodial arrangement, it made no "written finding in

the judgment or order detailing the specific relevant factors causing the rejection of such arrangement," *Section 452.375.6,* even though Father noted the need for such findings in his motion for new trial.[5] This was also error, as under these circumstances, section 452.375.6 clearly required the entry of such findings. *See Cunningham v. Cunningham,* 143 S.W.3d 647, 650 (Mo.App. E.D.2004). Accordingly, on remand the trial court should also make the required written findings detailing the specific relevant factors resulting in the rejection of Father's proposed custodial arrangement in compliance with section 452.375.6. *Id.*

■ Finally, Father claims the trial court also erred in failing to make the findings required by section 452.375.13, which states:

If the court finds that domestic violence or abuse, as defined in sections 455.010 and 455.501, RSMo, has occurred, the court shall make specific findings of fact to show that the custody or visitation arrangement ordered by the court best protects the child and the parent or other family or household member who is the victim of domestic violence or abuse, as defined in sections 455.010 and 455.501, RSMo, and any other children for whom such parent has custodial or visitation rights from any further harm.

Mother argues that no findings were required under section 452.375.13 because the trial court "made no specific finding"

3. Attached to a February 8, 2005, memorandum to the parties announcing the court's decision in this case was precisely the same type of summary checklist employed in *Schlotman,* to which Judge Czamanske referred in the memorandum as his "findings under Sec. 452.375, para. 6, RSMo." Counsel for Mother used this checklist to prepare the judgment of dissolution ultimately entered by the trial court, which was equally deficient and lacking in any discussion or detail.

4. Mother's brief does not address this argument.

5. Instead, the court merely issued the deficient findings discussed *supra* and stated that Mother's proposed custodial arrangement was "in the best interests of the minor child."

that "domestic violence or abuse, as defined in sections 455.010 and 455.501," had occurred. Father counters that Mother's argument is circular, in that it fails to address his argument that the trial court erred in failing to make the predicate finding in the first place. Faced with a somewhat similar situation in *Sewell–Davis v. Franklin*, 174 S.W.3d 58 (Mo.App. W.D. 2005), we disposed of the issue as follows: "[B]ecause we are remanding for additional findings as to the custody arrangement, the court on remand should either make an explicit finding that no abuse or domestic violence occurred or, if it did occur, make the required statutory findings in this regard." *Id.* at 65. That is an appropriate disposition here as well. Point granted.

### *The Joint Custody and Parenting Plan*

In his first point, Father argues that the trial court erroneously declared and applied the law in making an award of custody which did not serve Emma's best interests since it did not provide her with frequent, continuing, and meaningful contact with both of her parents upon the dissolution of their marriage, as required by sections 452.375.1(3) and 452.375.4. He further argues that in making its custody award, the trial court erroneously applied the law in considering Emma's gender, which is prohibited by section 452.375.8.

■ The record shows that the trial court granted Father and Mother joint physical custody of Emma.

'Joint physical custody' means an order awarding each of the parents significant, but not necessarily equal, periods of time during which a child resides with or

is under the care and supervision of each of the parents. Joint physical custody shall be shared by the parents in such a way as to assure the child of frequent, continuing and meaningful contact with both parents [.]

*Section 452.375.1(3)*. In relevant part, section 452.375.4 also provides:

The general assembly finds and declares that it is the public policy of this state that frequent, continuing and meaningful contact with both parents after the parents have separated or dissolved their marriage is in the best interest of the child ... In order to effectuate these policies, the court shall determine the custody arrangement which will best assure [that] both parents ... have frequent, continuing and meaningful contact with their children so long as it is in the best interests of the child.

Therefore, "[i]n arranging custody, courts must determine the *most likely course* to assure this contact between the children and each parent." *Dover v. Dover*, 930 S.W.2d 491, 496 (Mo.App. W.D.1996) (emphasis added).

■ Except for a two-week period each July, during which Father is apparently permitted to parent Emma on an uninterrupted basis,[6] the court's parenting plan gives Father a very limited amount of parenting time with Emma, consisting of a total of thirty hours every other weekend from 9:00 A.M. Saturday until 3:00 P.M. Sunday. What's more, the exchange point established by the court is in Topeka, Kansas, which is a two-hour drive away from Father's home in Wichita and a one-hour drive away from Mother's home in Weston. (Father's home and Mother's home are

---

**6.** We say "apparently" because the court's parenting plan is contradictory. At one point, it states that "Father shall have an uninterrupted two (2) week summer vacation" with Emma, but just two paragraphs later, it says

that "[d]uring Father's summer residential custody of [Emma], Mother shall have the same visitation privileges that Father has the remainder of the year."

located approximately 215 miles apart.) After subtracting four hours for travel time (which is entirely appropriate since the two hour-drive from Topeka to Wichita on Saturday and from Wichita back to Topeka on Sunday hardly constitutes meaningful parenting time for a child as young as Emma), this means that for all but two weeks of every year, Father has been given only twenty-six hours of parenting time on an every other weekend basis, effectively allotting him a mere nine percent of the total parenting time. Moreover, notes Father, although he has also been permitted to parent Emma on alternating major holidays, the court's parenting plan does not specify when that parenting time begins and ends on each such holiday. Father argues that in light of these circumstances, the custody arrangement adopted by the court does not comport with the statutory definition of joint physical custody in section 452.375.1(3), as it does not provide him "significant ... periods of time" during which Emma resides with and is under his care and supervision, and does not "assure [her] of frequent, continuing and meaningful contact with both parents."

We are unable to determine the merits of these claims because of the absence of findings discussed above. With regard to the determination of joint custody, however, we observe that the division of parenting time does not meet the definition of joint physical custody and that whatever disposition is made on remand, the proper nomenclature should be used. As to the division of parenting time where the parents are living some distance from each other, the trial court may want to consider *McElroy v. McElroy*, 910 S.W.2d 798 (Mo. App. E.D.1995).

### Child Support Award

In his fourth point, Father contends that the trial court erred in accepting the Form 14 prepared and submitted by Mother and awarding Mother child support of $1,090 per month for Emma's care. In particular, Father argues that the Form 14 used by the trial court to establish the amount of child support was erroneous since it allowed a monthly credit of $839 to Mother on Line 2(c) for support of a different child in her custody, but Mother adduced no substantial evidence at trial to establish an evidentiary basis for the amount of or her need for the credit.

"The appellate court must affirm the trial court's judgment regarding child support unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Smith v. Smith*, 94 S.W.3d 394, 396 (Mo.App. W.D.2003).

■ When a court determines child support in any proceeding, Rule 88.01 and section 452.340 require it to follow a two-step procedure. *In re Matter of Emig*, 117 S.W.3d 174, 178 (Mo.App. W.D.2003). First, the trial court "is required to determine and find for the record the PCSA [presumed child support amount] based on Form 14." *Id.* The second step requires the court "to consider all relevant factors and determine whether the PCSA should be rebutted as unjust or inappropriate." *Id.*

In reviewing an award of child support, we review the award, in light of the trial court's application of the two-step procedure[,] ... to determine whether it is supported by substantial evidence, is not against the weight of the evidence, and does not erroneously declare or apply the law. "After reviewing and determining that the trial court's application of the [two-step] procedure passes the *Murphy v. Carron* [536 S.W.2d 30 (Mo. 1976)]. standard, we then review for an abuse of discretion with respect to the

trial court's rebuttal review of its PCSA calculation."

*Id.* (citations omitted); *see also Simon–Harris v. Harris,* 138 S.W.3d 170, 175 (Mo.App. W.D.2004). In the first step, when finding for the record the PCSA the court can either accept a Form 14 offered by one of the parties or reject their Form 14 calculations and prepare its own Form 14. *Emig,* 117 S.W.3d at 178; *Simon–Harris,* 138 S.W.3d at 175. "In determining whether the trial court correctly calculated the presumed child support amount, this Court reviews the calculation to ensure not only that it is done accurately from a mathematical standpoint, but also that the various items and their amounts were properly included in the calculation *and supported by substantial evidence.*" *Stuckmeyer v. Stuckmeyer,* 117 S.W.3d 687, 690 (Mo.App. E.D.2003) (emphasis added); *see also McCandless–Glimcher v. Glimcher,* 73 S.W.3d 68, 80–81 (Mo.App. W.D.2002) ("[T]he inclusion of an item in the presumed child support amount calculation must be supported by substantial evidence."). "If any item is incorrect on a submitted Form 14, the ... court must reject the form and do its own calculations." *Emig,* 117 S.W.3d at 178.

In the case *sub judice,* the record shows that in making its award of child support of $1,090 per month, the trial court rejected Father's Form 14, accepted the Form 14 submitted by Mother, and awarded the PCSA based thereon, finding that amount to be just and appropriate. It also shows that in her Form 14, Mother claimed a Line 2(c) credit of $839 per month, evidently in consideration of her expenses associated with the support of Mary McClure, a nine-year-old child in Mother's custody who was not the subject of this case. While he acknowledges that Rule 88.01 and the comments to Form 14 allow for such a credit,[7] Father argues that the trial court "committed error when it blindly adopted the amount of [the] credit provided by [Mother in her Form 14] without an evidentiary basis". We disagree. The amount entered as an adjustment was calculated according to the comments. If Husband wished to contest that adjustment, we believe that it would be his burden to do so. *Jarrett v. Cornwell,* 130 S.W.3d 752, 759 (Mo.App. W.D.2004). Point denied.

### Parenting Plan

In his second point, Father asserts that the trial court erred in adopting Mother's parenting plan because there was a lack of substantial evidence to support it, it was against the weight of the evidence, and it was the product of an erroneous application of the law. Specifically, he claims that the parenting plan is missing provisions required by 452.375.9 and 452.310.7. Father also argues that the parenting plan *includes* two provisions that are unsupported by substantial evidence and against the weight of the evidence, thereby warranting reversal and remand.

7. "Line 2(c) of Form 14 provides for an adjustment to gross income for 'other children in the parent's primary physical custody."' *Jarrett v. Cornwell,* 130 S.W.3d 752, 759 (Mo.App. W.D.2004). The Form 14 Directions and Comments for Use state:

Line 2c: Adjustment to gross income for other children in primary physical custody DIRECTION: Enter the monthly amount of the support obligation of the parent for any children in his or her primary physical custody and not the subject of this proceeding. The amount of the adjustment is the amount in the schedule of basic child support obligations that represents that parent's support obligation based only on that parent's gross income and without any adjustment for other children for whom that parent is responsible.

*Id.* at 759 n. 5.

Section 452.375.9 states that "[a]ny judgment providing for custody shall include a specific written parenting plan setting forth the terms of such parenting plan arrangements specified in subsection 7 of section 452.310." Meanwhile, section 452.310.7 "specifies the minimum subject matters that must be contained in a parenting plan." *In re Marriage of Wilson,* 181 S.W.3d 575, 580–81 (Mo.App. S.D. 2005). The parenting plan adopted by the trial court in this case (1) does not detail the parties' custody, visitation, and residential time with Emma on major holidays, as required by section 452.310.7(1)(a); [8] (2) does not allocate the parties' custody, visitation, and residential time with Emma on her birthday, as required by section 452.310.7(1)(c); [9] (3) does not specify the times and places for transferring Emma between the parties in connection with the residential schedule, as required by section 452.310.7(1)(e); [10] (4) does not include details on how decision-making rights are to be shared, specifically decisions regarding child care providers, as required by section 452.310.7(2)(d); [11] and (5) does not specify which parent will maintain or provide health insurance for Emma, or how Emma's unreimbursed medical, dental, vision, psychological, or other health care expenses will be paid, as required by section 452.310.7(3)(b) [12] Father brought the

8. As noted *supra,* while the parenting plan entered by the trial court alternates the major holidays, it does not specify when the parties' parenting time on those holidays is to begin and end. Given that Mother and Father live 215 miles away from each other, this lack of specificity is problematic and raises the distinct possibility of needless litigation over such issues in the future. Indeed, as this court noted in *Davidson v. Fisher,* 96 S.W.3d 160, 166 (Mo.App. W.D.2003): "In order to prevent courts from being clogged with minor custody and visitation disputes, the trial courts must adopt complete and comprehensive parenting plans." Mother's brief simply ignores the issue.

9. *See, e.g., D.M.K. v. Mueller,* 152 S.W.3d 922, 930 (Mo.App. S.D.2005) (reversing and remanding the trial court's judgment as to custody and visitation with directions that the court prepare a parenting plan that complies with provisions of section 452.310.7 since the court's parenting plan did not detail custody, visitation, or residential time for the child on Father's Day as required by section 452.310.7(1)(c)). "A trial court is not free to disregard the events enumerated in Section 452.310.7." *Id.* Although she characterizes her parenting plan's omission of any parenting arrangements for a day as important as Emma's birthday as a mere "oversight," in her brief, Mother concedes that this was reversible error, as it was specifically required by statute.

10. Although she correctly notes that the parenting plan sets forth the beginning and ending date of Father's summer residential custody of Emma and also requires the parties to meet in Topeka, Kansas, at the beginning and end of that custodial period, Mother concedes error in her brief, admitting that "the time that [his] summer residential custody is to begin and end is not specified." Likewise, the parenting plan does not specify the beginning and ending times for Father's residential holiday custody. For the reasons described in our discussion of section 452.310.7(1)(a) *supra,* these errors must be corrected on remand.

11. *See, e.g., Cunningham,* 143 S.W.3d at 651 (reversal and remand required where parenting plan "lacked details on how the decision-making rights and responsibilities will be shared between the parties, specifically the decisions regarding child-care providers and how such providers would be selected, as required by section 452.310.7(2)(d)."). Mother's brief ignores this issue.

12. In her brief, Mother concedes reversible error, correctly noting that while the Form 14 adopted by the trial court allows her a Line 6(c) credit of $62 per month for the expense of maintaining Emma on her health insurance plan, nowhere in the court's judgment or parenting plan is Mother (or anyone else) required to carry health, dental, or vision insurance coverage on Emma. Nor, as Mother also concedes, do those documents specify how or in what proportion Emma's unreimbursed health care expenses will be paid and by whom.

mandatory requirements of section 452.310.7 to the attention of the court in his motion for new trial. Accordingly, the trial court's adoption of Mother's parenting plan is reversed and remanded for its entry of a complete and comprehensive parenting plan that is consistent with both the statutory requirements of sections 452.375.9 and 452.310.7 and the other specific instructions set forth *supra.* Point granted.

### *Allocation of Guardian Ad Litem Fees to the Parties*

■■■ As stated *supra,* because Father made allegations that Mother had abused and neglected Emma, the trial court appointed attorney Brad Grill[13] as Emma's guardian ad litem pursuant to section 452.423.2, RSMo Cum.Supp.2004. "The philosophy underlying the statute is that where abuse or neglect is alleged, the child has rights *independent of either of the parents, and these rights are entitled to representation." Taylor v. Taylor,* 60 S.W.3d 652, 655 (Mo.App. E.D.2001) (emphasis added).

■■■ "The role of the guardian ad litem involves more than perfunctory and shadowy duties." *In the Interest of J.L.H.,* 647 S.W.2d 852, 861 (Mo.App. W.D. 1983). Rather, a guardian ad litem serves as "the legal representative of the child at the hearing, and may examine, cross-examine, subpoena witnesses *and offer testimony." Section 452.423.3(1),* RSMo Cum. Supp.2004 (emphasis added). "The guardian ad litem also has a *duty* to conduct all necessary interviews with people having knowledge or contact with the child, and he may interview the child if appropriate." *Baumgart v. Baumgart,* 944 S.W.2d 572, 578–79 (Mo.App. W.D.1997); *see also Sec-*

*tion 452.423.3(2),* RSMo Cum.Supp.2004. A guardian ad litem's principal allegiance is to the court, and his function is to advocate what he believes to be the best interests of the child by providing the court requisite information bearing on those interests untainted by the parochial interests of the child's parents. *Guier v. Guier,* 918 S.W.2d 940, 950 (Mo.App. W.D. 1996); *In re Marriage of Patroske,* 888 S.W.2d 374, 384–85 (Mo.App. S.D.1994). "Even though the court is not bound by the opinion or recommendation of the GAL, it is imperative that the guardian ad litem investigate and have input on the perspective of the child's best interest and [that] *this be presented to the trial judge." Portwood–Hurt v. Hurt,* 988 S.W.2d 613, 619 (Mo.App. W.D.1999) (emphasis added) (internal quotation marks and citation omitted). In fact, given the nature of Father's multiple allegations of abuse and neglect and the extensive testimonial, documentary, photographic, and videographic evidence he adduced at trial to support them, "this case begged for careful consideration by the appointed guardian ad litem." *Keling v. Keling,* 155 S.W.3d 830, 834 (Mo.App. E.D.2005).

Despite this, the record demonstrates that the trial court received no meaningful evidence from the guardian ad litem. The guardian ad litem was concerned enough about the situation that he moved to intervene as a party to this appeal. He has also filed with this court a report he prepared concerning the allegations below, but we are unable to consider it because it was not presented to the trial court. Despite the fact that the guardian ad litem has the statutory right, under section 452.423.3(1), RSMo Cum.Supp.2004, to offer trial testimony as the legal representa-

---

**13.** Mr. Grill filed a motion to be added as a party to this cause on appeal, which this court sustained on June 27, 2005.

tive of the child, the record reveals that the trial court never heard from Mr. Grill about the abuse and neglect issues in the case except for only a few minutes just before the close of all the evidence.[14]

The only specific factual findings the trial court *actually made* in this case directly supported Father's claims of neglect. The trial court expressly found that Mother "has in her home 2 dogs that are incontinent and cause a health hazard." This finding, as well as the court's judgment ordering Mother to remove both dogs from her home and further providing that they "may no longer be permitted inside the home whatsoever," were supported by extensive and entirely unrebutted testimonial, video, and photographic evidence presented by Father at trial, which showed, among many other things, that: (1) the hair of Mother's two large breed dogs was matted with urine and fecal matter; (2) there were animal urine stains and acid burns located throughout Mother's home, including around Emma's diaper hamper and on other items in her bedroom; (3) Mother's home smelled strongly of animal urine and feces; and (4) there were clumps of dog hair and dander on the floors throughout Mother's home. Furthermore, the Chief Deputy Juvenile Officer for Platte County, Mark Lindsay, who had been appointed by the court to evaluate custody issues, testified at trial that had Mother's home been as depicted in the photographs when he made his home visit in April or May 2004, he would have been required, as a mandatory reporter of abuse and neglect, to make a call to the Missouri Child Abuse Hotline. Mr. Lindsay further testified he had serious concerns about the unsanitary conditions in Mother's home, specifically including animals urinating and defecating on the floor and the presence of animal hair and dander on the floor. The trial court also found that a home inspection conducted by Father's witness, civil engineer Frank Comer, on January 11, 2005, revealed that "certain natural gas lines in [Mother's] home are made of copper and that an electrical line located in the kitchen was not enclosed in conduit," thereby presenting additional safety hazards. For this reason, the court's judgment required Mother to repair and/or remedy these hazardous conditions by replacing "any current gas lines made of copper in her home with black pipe or other building code compliant material," as well as to "place in a proper electrical conduit the ... kitchen electrical power line or cord."

On remand the trial court shall reopen the record and receive substantive evidence from Mr. Grill before rendering its new judgment. *See Tipton v. Joseph–Tipton,* 173 S.W.3d 692, 694 (Mo.App. W.D. 2005); *In re Marriage of Mihalovich,* 659 S.W.2d 798, 801 (Mo.App. W.D.1983); *Hughes v. Bd. of Educ.,* 599 S.W.2d 254, 256 (Mo.App. S.D.1980).

■ Father also complains about the *allocation* of the GAL's fees. As provided in section 452.423.5, RSMo Cum. Supp.2004, a "guardian ad litem shall be awarded a reasonable fee for [his or her] services to be set by the trial court." The trial court may, in its discretion, "[i]ssue a direct payment order to the parties," violation of which may subject the non-paying party to sanctions for contempt, *Section 452.423.5(1),* or "[a]ward such fees as a judgment to be paid by any party to the proceedings," which constitutes a final

---

14. Mr. Grill used the "couple minutes" he was allotted by the trial court to briefly outline the services he had performed as Emma's guardian ad litem, as well as to inform the court as to the number of hours he had spent working on the case (32) and his normal hourly rate for such services ($150).

judgment in favor of the guardian ad litem and is "enforceable against the parties in accordance with chapter 513, RSMo," *Section 452.423.5(2)*. Accordingly, we review such orders and awards for abuse of discretion. *Stirling v. Maxwell*, 45 S.W.3d 914, 916 (Mo.App. W.D.2001) (citing *Stevens v. Stevens*, 977 S.W.2d 305, 310 (Mo. App. W.D.1998)). "An abuse of discretion is committed if the trial court's decision defies logic under the circumstances, is sufficiently arbitrary and unreasonable to shock the conscience of the court, and exhibits a dearth of careful consideration." *In the Interest of K.L.W.*, 131 S.W.3d 400, 404 (Mo.App. W.D.2004) (internal quotation marks and citation omitted).

■ The trial court made a total fee award of $4,800 to Mr. Grill. On July 26, 2004, the court issued a pre-trial direct payment order requiring Father and Mother "to pay the sum of $750.00 each … to be applied to [Mr. Grill's] fees in this matter," further directing that said funds be paid directly to the circuit clerk. As to the remaining $3,300 in GAL fees, in its judgment, the trial court ordered Father to pay $3,250 (98.5%) and Mother to pay $50 (1.5%), resulting in an overall allocation of $4,000 to Father and $800 to Mother, which represents a split of approximately 83% to 17%.

Under the circumstances presented by this case, this was an abuse of discretion. Since the very reason the court appointed Mr. Grill as Emma's guardian ad litem in the first place was to investigate Father's allegations of abuse and neglect on behalf of Emma, the court's decision to allocate the vast majority of Mr. Grill's fees to Father without even hearing from Mr. Grill as to those issues during trial was clearly against the logic of the circumstances. Therefore, on remand, after hearing evidence from the GAL, the trial court is directed to reconsider the amount of the GAL fees, as well as their apportionment to the parties. *See In re Marriage of Myers*, 845 S.W.2d 621, 626 (Mo.App. S.D.1992). Point granted.

### Attorney Fees

In his fifth point, Father claims that the trial court erred and abused its discretion in awarding Mother trial, post-trial, and appellate attorney fees pursuant to section 452.355.1. Father also claims the trial court abused its discretion in denying *his* request for an award of trial-related attorney fees. We will address each of these claims in turn.

■ In relevant part, Section 452.355.1 states:

Unless otherwise indicated, the court from time to time after considering all relevant factors including the financial resources of both parties,[15] the merits of the case and the actions of the parties during the pendency of the action,[16] may order a party to pay a reasonable

---

15. As to this factor, Missouri appellate courts applying section 452.355.1 have held that the following specific considerations are relevant: (1) each party's ability to bear his or her own litigation expenses, *Laubinger v. Laubinger*, 5 S.W.3d 166, 181 (Mo.App. W.D.1999); *Tracy v. Tracy*, 961 S.W.2d 855, 865 (Mo.App. S.D. 1998); and (2) a party's ability to pay any award of attorney fees which might be entered against him or her, *McDaniel v. McDaniel*, 982 S.W.2d 729, 732–33 (Mo.App. E.D. 1998).

16. This factor refers to a party's conduct during the marriage or during the litigation that may have unfairly increased the other party's attorney fees, including obstructing or impeding the discovery process. *See Calhoun v. Calhoun*, 934 S.W.2d 14, 15 (Mo.App. E.D. 1996); *Tracy*, 961 S.W.2d at 865; *Mabon v. Mabon*, 833 S.W.2d 488, 489 (Mo.App. W.D. 1992).

amount for the cost to the other party of maintaining or defending any proceeding pursuant to sections 452.300 to 452.415 and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding and after entry of a final judgment. The court may order that the amount be paid directly to the attorney, who may enforce the order in the attorney's name.

Section 452.355.1 gives the trial court discretion to order a party to a dissolution action to pay a reasonable amount of the other party's attorney fees and costs, *Taylor v. Taylor,* 12 S.W.3d 340, 348 (Mo.App. W.D.2000), because while it permits the trial court in a dissolution proceeding to make such an award, it does not compel or require it. *Thill v. Thill,* 26 S.W.3d 199, 208 (Mo.App. W.D.2000); *In re Marriage of Thompson,* 24 S.W.3d 751, 756 (Mo.App. S.D.2000). Even so, "[i]n most circumstances, parties to a dissolution case are responsible for their own attorney fees." *Miller v. Miller,* 184 S.W.3d 174, 186 (Mo. App. S.D.2006) (citing *Silcox v. Silcox,* 6 S.W.3d 899, 905 (Mo. banc 1999)) ("Generally, parties to a dissolution case pay their own attorney fees."). Thus, an award of attorney fees under section 452.355.1 represents the exception, rather than the rule.

 The party requesting an award of attorney fees in a dissolution action has the burden of proving his or her entitlement to such an award. *In re Marriage of Trimble,* 978 S.W.2d 55, 59 (Mo.App. S.D. 1998). In determining whether a party who has been awarded such fees has met his or her burden of proof, we must keep in mind that "an attorney fee award per section 452.355.1 is not one of unregulated discretion." *Miller,* 184 S.W.3d at 186. "In ruling a party's request for attorney fees in a dissolution case the trial court *must* consider *all* relevant factors, includ-

ing the financial resources of the parties, the merits of the case, and the actions of the parties during the pendency of the action." *Id.* (emphasis added). Thus, while section 452.355.1 gives a trial court considerable discretion in deciding whether to award reasonable attorney fees in a dissolution action, the court must base its decision upon careful consideration of all relevant factors bearing on the propriety of the award, *Bixler v. Bixler,* 810 S.W.2d 95, 102 (Mo.App. E.D.1991), and must exercise the discretion with which it is invested "[w]ithin the confines of the law and the evidence." *In re Marriage of Baker,* 986 S.W.2d 950, 954 (Mo.App. S.D.1999).

### *Award of Trial–Related Attorney Fees to Mother*

The trial court awarded Mother $11,000 in trial-related attorney fees and expenses. The record demonstrates that the trial court undertook to rule on the issue with virtually no input from the parties and without the benefit of hearing from either of them as to whether the relevant factors justified an award of trial-related attorney fees to Mother. In this regard, the record shows that Mother's attorney, Ms. Breen, neglected to address Mother's request for attorney fees in any way until she had one minute of trial time remaining, at which time she hastily attempted to examine her client as to the issue for the first time on redirect examination. The trial court sustained Father's objection that this was improper since the issue of attorney fees had never been broached on direct or cross-examination of the witness. Nevertheless, after Ms. Breen announced "[n]othing further," the trial court, without a motion or other request from Ms. Breen and wholly on its own initiative, expressly invited her to proceed, stating: "Now, Ms. Breen, as an independent part of your case, do you have anything else that you wish to bring up?", Ms. Breen replied: "Yes, sir.

[Mother] has requested attorney's fees in this matter." Counsel for Father then began to make an objection, but hadn't even had a chance to say what it was before the trial court interrupted him, saying, "I'm going to overrule it." Ms. Breen subsequently offered Exhibit N (a summary of trial-related attorney fees and expenses prepared by Mother), which was admitted into evidence shortly thereafter. Other than Exhibit N, Mother adduced no evidence in support of her request for trial-related attorney fees and expenses, and there was no argument or hearing of any kind on the issue before the trial court made its award.

Although Father makes several complaints about the fairness and propriety of this procedure, the principal problem was addressed by our Supreme Court in *O'Brien v. B.L.C. Insurance Co.*, 768 S.W.2d 64 (Mo. banc 1989), in which the court held that it is reversible error for a trial court to make an award of attorney fees without first hearing from the parties on the issue: "Numerous authorities hold that the trial judge is an expert on the subject of attorneys' fees and may award fees even though no evidence of reasonableness is introduced. We do not disagree with this general proposition, but, when attorneys' fees are in issue, the court should hear from the parties just as in other matters. The trial judge erred in not doing so." *Id.* at 71 (footnote omitted);[17] *see also Daily v. Daily*, 912 S.W.2d 110, 114 (Mo.App. W.D.1995) ("Attorney fees can be awarded only if the parties are afforded adequate notice and *a full opportunity to be heard*.") (emphasis added).

■ Since the trial court did not hear from the parties on the issue of Mother's request for trial-related attorney fees,[18] we reverse the award of $11,000 in trial-related attorney fees and expenses to Mother and remand to the trial court with directions to hear the parties, and, in the *sound* exercise of its discretion, enter a new judgment, consistent with the principles set out in this opinion, which is supported by the law and the evidence.[19] *O'Brien*, 768 S.W.2d at 72.

### Award of Post–Trial Attorney Fees to Mother

A week after Father submitted his motion for new trial; Mother requested an award of $1,000 in *post-trial* attorney fees, also to be paid by Father. Father filed his response to Mother's motion for additional attorney fees on March 31, 2005. At a motion hearing conducted on April 14, 2005, Mother's attorney justified her request as follows:

**17.** The *O'Brien* court proceeded to vacate the award and remand the cause to the circuit court "with directions to hear the parties and determine an appropriate fee under the guidance of this opinion." *Id.* at 72.

**18.** With regard to Mother's Exhibit N, we note that the trial court asked no questions of Mother or her attorney but merely stated: "Just hand me your exhibit." There was no cross-examination (nor could there be, as there was no witness on the stand but only a sheaf of papers handed to counsel for Father by Ms. Breen), no oral argument, and no other advocacy by the parties. In stark contrast, the record shows that when Father pre-

sented evidence during his case in chief pertaining to *his* request for an award of attorney fees from Mother, the trial court asked several questions of his witnesses *sua sponte.*

**19.** In *Travis v. Travis*, 163 S.W.3d 43, 47, 49 (Mo.App. W.D.2005), we held that "[a]nalysis of the trial court's judgment reveals insufficient evidence for this court to properly determine the equity of the underlying award" and that other "deficiencies of the judgment preclude[d] meaningful review of the court's property division." Meanwhile, in the case *sub judice*, the court's findings are even more deficient than those in *Travis*.

MS. BREEN: I believe, Your Honor, that Mr. Davis [Father's attorney] has filed an after trial motion on behalf of his client. Even though he has not called it up for a hearing, I still had to review that motion and check out citations for possible argument. So I'm requesting attorney's fees for the time I had to spend doing that as well as talking to my client.

.　　.　　.　　.　　.

THE COURT: Do you want to say anything else, Miss Breen?

MS. BREEN: No, I'm just requesting additional attorney's fees and on my motion I did attach an exhibit of the times spent.

THE COURT: Since you're here, tell me what it is you're requesting?

MS. BREEN: I would like the attorney's fees I believe it's in the amount of a thousand dollars.

THE COURT: How much?

MS. BREEN: One thousand.

THE COURT: One thousand? All right.

Father's attorney then argued that such an award would be unjustified. However, the court did not rule Mother's motion at that time.

The issue was revisited during a hearing on Father's motion for new trial, which took place on May 19, 2005. At this time, Ms. Breen stated that she wished to renew Mother's motion for additional attorney fees. After hearing additional oral argu-
ment on the matter, the trial court took Mother's motion for additional attorney fees under advisement, ultimately issuing an order which stated: "The Court finds that [Mother] has incurred additional reasonable attorney fees after trial.... [Mother's] Motion for Additional Attorney Fees is sustained and [Father] is ordered to pay [Mother's] attorney, Jacki Breen, $1,000.00."

██　After carefully reviewing the record, we do not believe the court's award was an abuse of discretion. Father's motion for new trial was exceptionally long, as it totaled some 172 pages and cited well over 100 cases.[20] The trial court could have logically and properly taken into account the time necessary to read and analyze and be ready to respond to such a lengthy, detailed motion. Nor was the amount awarded unreasonably high, as it represented Ms. Breen's fee for the approximately 7.5 hours it took her to read and analyze the motion, review the citations contained therein, and prepare for argument.[21] Taking all the circumstances here into account, the trial court's order requiring Father to pay Ms. Breen $1,000 in post-trial attorney fees for reviewing his motion and checking out its scores of citations for possible argument was neither against the logic of the circumstances nor so arbitrary and unreasonable as to shock this court's sense of justice and to indicate a dearth of proper judicial consideration. Accordingly, the trial court's order requiring Father to pay Mother's attorney $1,000 in post-trial attorney fees is affirmed.

**20.** Although the motion turned out to be meritorious in many respects, one cannot help but wonder about over-lawyering on the part of counsel for Father. While the motion was necessary to preserve Father's complaints about the lack of findings for appellate review, *see Rule 78.07(c)*, this hardly necessitated a motion of such length and complexity because, "[e]xcept as otherwise provided in
Rule 78.07(c), in cases tried without a jury or with an advisory jury, neither a motion for a new trial nor a motion to amend the judgment or opinion is necessary to preserve any matter for appellate review." *Rule 78.07(b).*

**21.** As we note later in this opinion, Mother's attorney fees in total through trial were less than 1/10 of Father's fees.

### Award of Appellate Attorney Fees to Mother

On the next day after the trial court granted Mother's motion for additional attorney fees in the amount of $1,000, Mother filed a *third* request for attorney fees, this time asking for an award of $25,000 in *appellate* attorney fees. Mother's motion averred that Father should be required to pay her attorney's fees on appeal since: (1) the "Court's file establishes that [Father] has significantly more financial resources than [Mother]"; (2) Mother's "position at HCA has been terminated, therefore, [she] sought other employment at KU Medical Center and now makes approximately $5,115.91 per month," as opposed to the $6,393.00 per month reflected in the court's Form 14; and (3) Father's Statement of Marital Property and Non–Marital Property and Liabilities, dated January 17, 2005, purportedly demonstrated that his "net worth, excluding the value of his personal residence, exceeds $430,000.00." [22] The motion further averred that "[c]ounsel for [Mother] anticipates that the appeal will be resolved in favor of [Mother] and that this Court's Judgment will be upheld," and requested that Father be required to pay the sum of $25,000 "in advance" of the prosecution of his appeal. Attached to Mother's motion was a June 8, 2005, affidavit from Ms. Breen, in which she estimated that to defend Father's appeal would require her or her colleagues to perform 143 hours of work at an hourly rate of $175, as well as $750 in expenses for photocopying, postage, and delivery. [23]

On June 24, 2005, Father filed suggestions in opposition to Mother's motion for appellate attorney fees, together with a notarized affidavit from Father, dated June 21, 2005, which indicated that his most significant financial asset (his 401(k) retirement account and Financial Security Retirement Plan with Boeing, which had a value of $326,723) was inaccessible by him at this time, and that he had an outstanding debt burden of $124,981, including an outstanding balance of $73,000 on a loan made to him by his father evidently to help cover his trial-related attorney fees and expenses. As a result, according to the affidavit, Father claimed a *negative* net worth of (-$64,525) after the dissolution, rather than a positive net worth of more than $430,000 as claimed by Mother. In his suggestions in opposition to Mother's motion, Father also averred that based on the record then before the trial court, his appeal was brought in good faith, presented "justiciable questions for review," and was "likely to be successful."

On September 15, 2005, the trial court conducted a hearing on Mother's motion for appellate attorney fees. Mother did not appear at this hearing, during which Ms. Breen presented no evidence of the then-current financial resources of Mother *or* Father (or anything else, for that matter) and did not rebut Father's affidavit, but merely urged the court to "take judi-

---

**22.** Mother's motion did not state what Mother's net worth was claimed to be, and gave the court no basis for making a comparison. Furthermore, the document upon which Mother relied (Father's Statement of Marital Property and Non–Marital Property and Liabilities, dated January 17, 2005) was filed some nine months before the hearing on Mother's motion for appellate attorney fees and obviously did not reflect his then-current financial condition.

**23.** The affidavit did not break down or itemize counsel's anticipated fees by the type or nature of appellate legal work to be performed, meaning that the trial court had no basis upon which to determine how much time counsel planned to spend performing each activity. It simply stated that a total of 143 hours would be required.

cial notice of its own file" in the dissolution action. Father argued, *inter alia*, that his affidavit showed that he "does not have the assets to afford a $25,000 payment for appellate attorney's fees," that such an award would be neither proper nor authorized by law, and that he should not be forced to serve as Mother's automated teller machine simply for exercising his right to appeal the court's judgment. At this time, Father also filed an affidavit from his attorney indicating that as of September 20, 2005, Father still owed him the sum of $23,424.05 in attorney fees and expenses.

On September 20, 2005, the court entered its Judgment/Order for Attorney Fees and Expenses on Appeal, which awarded Mother and her attorney $25,000 in appellate legal fees and $750 in expenses, all to be paid by Father. The court made the following findings:

> All pleadings have been considered; this Court takes judicial notice of the entire trial proceedings. [Father] requested $191,503.33 as legal fees and $25,801.33 as expenses in the trial of this case; [Mother] requested [a] total of $15,845.28 at trial. Counsel stated that 19 volumes of 200 pages each have been filed in the MCA WD [24] as the legal file therein. Ms. Breen's estimates of $25,000 in fees and $750 in expenses to defend the appeal filed by [Father] are noted to be less than the expenses alleged by [Father] in the trial of this case; her estimates are reasonable, and same are to be paid by [Father].

Section 452.355.1 authorizes an award of attorney fees on appeal in a dissolution case, even while the appeal is pending. *Hatchette v. Hatchette*, 57 S.W.3d 884, 893 (Mo.App. W.D.2001).[25] "An order deciding fees on appeal under Section 452.355 RSMo is itself a final appealable order." *Clarke v. Clarke*, 983 S.W.2d 192, 195 (Mo.App. E.D.1998).

In determining the propriety of an award of appellate attorney fees in a dissolution action under section 452.355.1, the court must consider "the financial history of the parties since the dissolution being appealed was granted." *In re Marriage of Sumners*, 677 S.W.2d 435, 436 (Mo.App. S.D.1984). The fact that a party has already been granted a separate award of trial-related attorney fees and expenses in a dissolution action is also a relevant factor to be considered by the trial court in deciding whether to make a further award of appellate attorney fees to that party. *See Coleberd v. Coleberd*, 933 S.W.2d 863, 871, 872 (Mo.App. S.D.1996); *Romkema v. Romkema*, 918 S.W.2d 294, 298 (Mo.App. E.D.1996); *Roberts v. Roberts*, 652 S.W.2d 325, 331 (Mo.App. W.D.1983). Moreover, in making an award of attorney fees, "a court must know what debts each party owes," as well as what employment and non-employment income each party has, "before it can determine either need or ability to pay" such fees. *Barancik v. Meade*, 106 S.W.3d 582, 594 (Mo.App. W.D.2003). Furthermore, when reviewing

---

**24.** We presume this is shorthand for the Missouri Court of Appeals for the Western District.

**25.** Under section 452.355.1, trial courts have jurisdiction to award attorney fees for services rendered on appeal in a dissolution case even though the requesting party does not file his or her motion for attorney fees until after the notice of appeal has been filed and the appellate court has issued its decision in the underlying case, but before the mandate has been issued. *Meierer v. Meierer*, 876 S.W.2d 36, 37 (Mo.App. W.D.1994). In fact, a trial court has jurisdiction to award attorney fees for an appeal in a dissolution case even *after* issuance of the appellate court's mandate, as long as the motion for fees was filed prior to the mandate and the trial court had not already ruled on it. *Clarke v. Clarke*, 983 S.W.2d 192, 195 (Mo.App. E.D.1998).

the propriety of a trial court's award of appellate attorney fees and expenses, this court may consider "the quantity and quality of legal services rendered by the [moving party's] attorney in connection with [the] appeal," *Eckstein v. Eckstein*, 748 S.W.2d 945, 949 (Mo.App. E.D.1988), because unlike the trial court, "this court has the advantage of having the transcript of what transpired" at trial, as well as "the opportunity to see the briefs filed in this court and know what has transpired with respect to oral argument," *Boyer v. Boyer*, 567 S.W.2d 749, 751 (Mo.App. W.D.1978).

Under the circumstances presented in this case, we hold that the trial court erred and manifestly abused its discretion in ordering Father to pre-pay $25,750 of Mother's anticipated attorney's fees and expenses on appeal.

Since the hearing on Mother's motion for appellate attorney fees took place approximately eight months after trial and no evidence of Mother's post-dissolution financial condition was presented by Mother, in making its award, the court could not possibly have considered the post-dissolution financial circumstances of the parties, as required by Missouri law. In *In re Marriage of Sumners*, wife filed a motion requesting an award of appellate attorney fees after the court's entry of a decree of dissolution, in which she alleged that her attorney fees on appeal were estimated at $4,000, that she was without funds with which to pay her attorneys, and that husband was "fully capable of paying the same." 677 S.W.2d at 436. After a hear-

ing, the trial court awarded wife $2,500 in appellate attorney fees. *Id.* As to the financial history of the parties since the dissolution being appealed was granted, while wife presented evidence of her own financial history since the dissolution, she failed to adduce any evidence as to husband. *Id.* Husband appealed the trial court's order sustaining wife's motion for attorney fees on appeal and the Southern District reversed, holding that the lack of "evidence of the husband's financial history since the dissolution, is fatal." *Id.*[26]

Likewise, in *Heins v. Heins*, 783 S.W.2d 481 (Mo.App. W.D.1990), husband complained of the allowance to the wife of $1,550 in attorney fees for services to be rendered on appeal, contending that with the "other financial obligations imposed upon him in other aspects of the case, he [could not] afford to defray this additional charge." *Id.* at 485. Although the hearing on wife's motion for an award of attorney fees on appeal was conducted three months after the decree of dissolution was entered, the trial court did not receive any evidence on father's "current financial circumstances, relying instead on the evidence presented at trial." *Id.* After noting that among "[t]he evidence bearing on the subject should have been the financial circumstances of the parties" as of the date of the hearing, we proceeded to hold that such evidence "was not supplied in the detail necessary for the trial court to rule nor for this court to review the ruling. The record therefore necessitates reversal of the allowance of attorney fees on ap-

**26.** Both this court and the Eastern District have followed *Sumners* on this point. *See Mozingo v. Mozingo*, 779 S.W.2d 284, 285 (Mo.App. W.D.1989) (following *Sumners* in reversing an award of $8,861 in post-trial attorney fees and expenses to wife since the trial court "was required to have some evidence of [the husband's] financial history [since the date of the dissolution] before mak-

ing an award of substantial attorney fees" against him); *Eckstein*, 748 S.W.2d at 948 & n. 2 (noting that although the court below had the authority to award the wife additional attorney fees for appeal, under *Sumners*, "it could not properly do so without any evidence of the wife's financial resources" since the dissolution).

peal." *Id.* We did not remand for further proceedings, and reversed the erroneous award outright. *Id.*

■ In the case *sub judice*, the record demonstrates that Mother failed to present any evidence whatsoever as to her financial history since the dissolution, including the bald assertions, in her motion for appellate attorney fees, that she had changed jobs since the dissolution decree had been entered and that her monthly income had dropped from $6,393 to $5,115.91. As correctly argued by Father during the September 15, 2005, hearing on Mother's motion for appellate attorney fees: "There's been no evidence presented, oral argument is not an evidentiary hearing." *See, e.g., Lombardo v. Lombardo,* 120 S.W.3d 232, 241 (Mo.App. W.D.2003) (noting that "allegations in a motion are not self-proving."); *Baker v. State,* 180 S.W.3d 59, 64 (Mo.App. S.D.2005) (holding that the allegations in a motion "are not self-proving, and a movant has the burden of proving the grounds asserted."); *S.M.B.,* 810 S.W.2d at 606 (observing that as the moving party, the mother "had the burden of supporting her request for attorneys' fees."). Indeed, under the circumstances present here, the trial court's ruling effectively "deprived [Father] of the right to have [Mother's] claims determined on the basis of evidence." *Schindler v. McCluskey,* 58 S.W.3d 48, 49 (Mo.App. E.D.2001).

For these reasons the trial court abused its discretion in ordering Father to prepay $25,750 of Mother's anticipated attorney fees and expenses on appeal. The court's award of $25,750 in appellate attorney fees and expenses to Mother must be reversed. *Sumners,* 677 S.W.2d at 436–37; *Mozingo,* 779 S.W.2d at 285; *Heins,* 783 S.W.2d at 485; *Barancik,* 106 S.W.3d at 594.

■ "Pursuant to Rule 84.14, when an appellate court finds the trial court has abused its discretion, it may enter the judgment the trial court should have entered, effective at the time of the decree." *Baker,* 986 S.W.2d at 957 (citation omitted); *see also In re Marriage of Zavadil,* 806 S.W.2d 506, 513 (Mo.App. E.D.1991) (noting that when the trial court errs in making an award of attorney fees, "Rule 84.14 permits the appellate court to award or give judgment as the trial court ought to have given."). As in *Heins* and *Barancik,* we reverse outright and decline to exercise our discretion to remand since the award is not only unsupported by substantial evidence and against the weight of the evidence, but Father also repeatedly advised the court and opposing counsel that Mother was required to present evidence of her post-dissolution financial condition to be entitled to an award of appellate attorney fees. Nevertheless, Ms. Breen chose not to present such evidence, successfully *objected* to the introduction of any post-trial testimony during an earlier hearing, and convinced the trial court to decide the issue solely on the basis of the trial record. Moreover, the other relevant factors discussed *supra* all weigh against the award.

### Denial of Father's Request for an Award of Trial–Related Attorney Fees

In his Petition for Dissolution of Marriage and in a subsequent motion filed just before the start of trial, Father requested an award of trial-related attorney fees from Mother. In its judgment, the trial court denied Father's request, making a finding which states, in its entirety: "[Father] requested [that Mother] pay his legal fees in the amount of $191,503.33 and expenses in the amount of $25,801.00. Under the circumstances known to the Court, said fees and expenses are unreasonable."

Thus, as best we can tell, the court declined to make an award of trial-related attorney fees and expenses to Father on the ground that the amount of his request was unreasonably large under the circumstances.

■ Father argues this was an abuse of discretion, pointing out that his attorney presented twenty-three witnesses at trial (including two expert witnesses), prepared a comprehensive joint stipulation settling the property division issues in the case prior to trial, investigated and uncovered a substantial financial asset (namely, a retirement account worth approximately $20,000) that Mother admitted she failed to disclose during discovery, prepared dozens of pleadings and pre-trial motions, prepared for and participated in six different hearings and obtained and filed twenty sets of business records with accompanying records affidavits bearing on the issues presented at trial. Father also notes that his attorney hired, prepared for trial, and presented the testimony of two private investigators who conducted surveillance of Mother, resulting in a wealth of unrebutted testimonial, documentary, photographic, and videographic evidence

to substantiate his allegations of abuse and neglect.[27] The record also contains Father's Exhibit 216, which broke down the attorney fees and litigation expenses incurred by Father in a way which was at least as detailed and informative as Mother's Exhibit N, upon which the court relied in making its award of $11,000 in trial-related attorney fees and expenses to Mother.

■ Father complains that the trial court made no findings as to *why* it found Father's request for an award of $191,503.33 in attorney fees and $25,801 in expenses to be unreasonable. No findings were required and the reason for the court's conclusion was self-evident on the record before us: the amount of the request (nearly $225,000 for a dissolution trial lasting three days) was grossly excessive. Point granted in part and denied in part.

### Recusal

■ In his sixth and final point, Father argues that the trial judge erred in failing to recuse himself *sua sponte* during trial, arguing that despite his duty to maintain

27. The record shows that in August 2004, Mother filed a complaint with the Kansas Bureau of Investigation in which she alleged that two of Father's private investigators had illegally entered her home on at least three occasions. At trial, Father introduced and the court admitted into evidence a September 21, 2004, letter to Mother from Mary Feighny of the Kansas Attorney General's Office indicating that Mother's allegations had been determined to be unfounded and that the Attorney General had "decided not to pursue any further investigation" and would "not pursue this matter any further." Although the record reveals absolutely no basis for any such aspersions, in her brief, Mother nevertheless makes various indirect negative references to the investigators and the means by which they obtained the evidence they presented at trial. However, "there is nothing procedurally improper about the use of surveillance" of the

type performed here. *Delta Family–Care Disability & Survivorship Plan v. Marshall*, 258 F.3d 834, 841 (8th Cir.2001). In fact, the record shows that despite Mother's insinuations to the contrary, this evidence was properly admitted in the case and was properly disclosed to Mother during discovery. For these reasons, we agree with Father that the trial court erred to the extent it may have chosen to discredit that evidence on the sole ground it was obtained via what Mother or the court considered to be inherently improper methods—which appears to be a very real possibility on this record. *See generally Worthington v. State*, 166 S.W.3d 566, 579 (Mo. banc 2005) (trial judge may not consider evidence properly in the case for an illegitimate purpose and may not form an opinion on the merits on some basis other than what the judge learned from the judge's participation in the case).

an impartial attitude and a status of neutrality at all times, his actions throughout the proceedings in this case demonstrated that a reasonable and disinterested bystander, unacquainted with the personality, integrity, and dedication of the judge, would have a reasonable factual basis to find an appearance of impropriety and thereby doubt the impartiality of the court. *See, e.g., Roe v. Ross,* 701 S.W.2d 799, 804 (Mo.App. W.D.1985). While "[t]here is a presumption that a trial judge would not undertake to preside over a case where his or her impartiality might reasonably be questioned," this "presumption is rebutted, requiring a judge to recuse himself or herself, with or without an application, where there is actual bias and prejudice, or an appearance of impropriety." *Robin Farms, Inc. v. Bartholome,* 989 S.W.2d 238, 246 (Mo.App. W.D.1999) (internal citations omitted).

 Bias must arise generally from an extrajudicial source that results in the judge forming an opinion on the merits based on something other than what the judge has learned from participation in the case. *State v. Jones,* 979 S.W.2d 171, 178 (Mo. banc 1998). Opinions and beliefs that a judge forms about a party, the party's claim or legal position or counsel that arise from hearing a case are completely natural and not improper. Although they may be best left unexpressed, such beliefs and opinions are not a disqualifying appearance of impropriety. Point denied.

### Conclusion

The trial court's custody award and parenting plan are both reversed because of the lack of findings necessary to review them. On remand the trial court is directed to hear evidence from the guardian ad litem and to reconsider the amount of the GAL fees, as well as their apportionment to the parties. Given its concerns about Emma's living conditions, the trial court, in its discretion, may allow additional evidence concerning the circumstances of the child since the rendition of its judgment particularly. After hearing any such evidence, the trial court shall make the appropriate required findings and enter a new custody order and parenting plan as appropriate. If the court makes changes in the custody and parenting arrangements it may be required to modify its child support order. The trial court's judgment ordering Father to pay $25,750 of Mother's anticipated attorney fees and expenses on appeal is reversed outright, while its award of $11,000 in trial-related attorney fees and expenses to Mother is reversed and remanded with directions to give both parties an opportunity to be heard. The court's orders requiring Father to pay Mother's attorney $1,000 in post-trial attorney fees and denying Father's request for an award of trial-related attorney fees and expenses are affirmed.

VICTOR C. HOWARD, Presiding Judge, and LISA WHITE HARDWICK, Judge, concur.